**Electronically Filed
Supreme Court
SCOT-17-0000630
10-MAY-2019
08:02 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

In the Matter of the Application of

HAWAIʻI ELECTRIC LIGHT COMPANY, INC.

For Approval of a Power Purchase Agreement for Renewable
Dispatchable Firm Energy and Capacity.

SCOT-17-0000630

APPEAL FROM THE PUBLIC UTILITIES COMMISSION
(Docket No. 2017-0122)

MAY 10, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

This case arises from the Public Utilities Commission's approval of an amended power purchase agreement (Amended PPA) between Hawaiʻi Electric Light Company, Inc. (HELCO) and Hu Honua Bioenergy, LLC. Pursuant to the Amended PPA, Hu Honua would construct and operate a biomass-fueled energy production

facility, and HELCO would purchase energy from the facility.

Life of the Land (LOL), an environmental nonprofit organization, sought to intervene as a party in the PUC's proceeding in order to address the environmental impacts of the proposed biomass facility. The PUC denied LOL full party status, but granted LOL limited participation in the proceeding. The PUC ultimately approved the Amended PPA without holding a hearing.

LOL directly appealed the PUC's order granting it limited participation in the proceeding, as well as the Decision and Order approving the Amended PPA (2017 D&O), to this court. LOL argues that the PUC: (1) failed to explicitly consider greenhouse gas (GHG) emissions in determining whether to approve the Amended PPA, as required by state law; (2) denied LOL due process to protect its interest in a clean and healthful environment by restricting its participation in the proceeding; and (3) abused its discretion and violated due process by denying LOL full party status in the proceeding. In addition to disputing these allegations, the PUC, HELCO, and Hu Honua contest this court's jurisdiction over the matter.

As a threshold matter, we hold that this court has jurisdiction to consider LOL's appeal. We further hold that the PUC erred by failing to explicitly consider the reduction of GHG emissions in approving the Amended PPA, as required by statute, and that the PUC denied LOL due process with respect to the opportunity to be heard regarding the impacts that the Amended

2

PPA would have on LOL's right to a clean and healthful environment. Finally, we need not resolve whether the PUC abused its discretion or deprived LOL of due process by denying it full party status in the proceeding.

Accordingly, we vacate the 2017 D&O and remand this matter to the PUC for further proceedings.

## I. BACKGROUND

### A. PUC Proceedings

#### 1. 2012 Docket

In 2012, HELCO submitted an application to the PUC seeking approval of a power purchase agreement (Original PPA) with Hu Honua. Pursuant to the Original PPA, Hu Honua agreed to refurbish an existing biomass power plant located on the Hāmākua Coast in Pepeʻekeo, Hawaiʻi, to allow it to utilize harvested timber and other "woody biomass" as a fuel source. HELCO agreed to purchase energy from the facility over the Original PPA's 20-year term.

LOL filed a Motion to Intervene as a party-intervenor in the PUC proceeding (2012 Docket), pursuant to Hawaiʻi Administrative Rules (HAR) § 6-61-55 (effective 1992-2018).[1] In

---

[1] We note that HAR title 6, chapter 61 - Rules of Practice and Procedure Before the Public Utilities Commission (effective 1992-2018) - was repealed on January 1, 2019. It was replaced by HAR title 16, chapter 601 (effective Jan. 1, 2019). All of the repealed administrative rules referenced in this opinion have been replaced by identical rules that remain in effect.

HAR § 6-61-55 (effective 1992-2018) has been replaced by HAR § 16-601-55 (effective Jan. 1, 2019). See infra note 22.

3

its motion, LOL explained that it is a Hawai'i-based nonprofit organization comprised of members who live, work, and recreate in Hawai'i. LOL highlighted its environmental interests and explained that the externalities associated with the use of biofuels for energy production "[can] be very harmful to [its] interests." LOL also stated it "has developed great expertise in biofuels" and has demonstrated its expertise in several regulatory proceedings regarding biofuels.

More specifically, with regard to the proposed Hu Honua facility, LOL stated it had "several concerns, including the fuel source, the comparative cost, . . . [and whether] this proposed facility will cut into the utilities['] purchase of energy from existing and/or planned wind and solar farms." Finally, LOL stated it had "unique environmental interests different from the general public," and assured the PUC that its intent was "not to disrupt the process[,] but . . . to insure that [LOL's] members and our local environmental communities have a voice in this process."

The PUC found that the "concerns raised in [LOL's] Motion to Intervene provide[d] insufficient basis to justify full intervention[.]" However, it also found that "LOL's concerns regarding the proposed project's impact on existing renewable projects on the Big Island, and the supply and pricing analysis between the biomass resources delineated in the [Original] PPA [were] sufficient to justify LOL having limited participant

4

status in [the 2012 Docket], pursuant to HAR § 6-61-56." Accordingly, the PUC denied LOL's motion, but granted it "limited participant status" <u>sua sponte</u>, allowing it to participate with respect to: (1) whether the energy price components properly reflect the cost of biomass fuel supply; and (2) whether HELCO's purchase power arrangements under the Original PPA are prudent and in the public interest.

The PUC ultimately approved the Original PPA, but HELCO subsequently terminated the agreement. HELCO and Hu Honua agreed to amend the Original PPA, giving rise to the Amended PPA at issue in the instant case.

**2. 2017 Docket**

In 2017, HELCO filed an application with the PUC, seeking approval of the Amended PPA. The PUC entered Order No. 34554, opening Docket No. 2017-0122 (2017 Docket) to address HELCO's request. The order also granted LOL "conditional participant status" in the proceeding and stated it would reevaluate LOL's status and establish the scope of LOL's participation following its final determination of the issues governing the 2017 Docket.

LOL filed exhibits in response to Order No. 34554, which included an overview of the "agricultural expertise" of Henry Curtis, LOL's Vice President of Consumer Issues. Curtis explained that he had "stayed with friends living in Hamakua, stayed at vacation sites in Hamakua, explored Hamakua, and made

several trips to the Hu Honua site, driving around three sides of the site."[2]  In support of his agricultural expertise, Curtis also cited to a chapter that he authored in "The Value of Hawaiʻi:  Knowing the Past, Shaping the Future," which cites runoff into the ocean as one of the primary adverse environmental impacts associated with the use of biofuels for energy production.

        The PUC entered Order No. 34597, establishing a procedural schedule, statement of the issues, and scope of participation for participants.  The PUC permitted LOL to participate in the proceeding, but limited the scope of its participation to the same two issues that it participated on in the 2012 Docket:

> 2.a.i. Whether the energy price components in the Amended and Restated PPA properly reflect the cost of biomass fuel supply.
>
> 2.b. Whether HELCO's purchase power arrangements under the Amended and Restated PPA are prudent and in the public interest.
>
> Specifically, the PUC found that:
>
> Because the question of whether HELCO's purchase power arrangements under the Amended and Restated PPA are prudent and in the public interest continues to be an issue in this proceeding, as it was in Docket No. 2012-0212, the commission finds it appropriate to maintain LOL, Tawhiri, and HEP's participant status on

---

    [2]    It appears Curtis was referring to the Big Island's Hāmākua Coast, of which Pepeʻekeo is a part.

this issue (Issue 2.b., above).[3]  Further, while not
explicitly stated, the question of whether the energy
price components properly reflect the cost of biomass
fuel supply is a consideration when determining
whether the purchased power costs to be paid by HELCO
pursuant to the Amended and Restated PPA are
reasonable (Issue 2.a., above). Accordingly, the
commission finds it appropriate to maintain LOL's
participant status on the specific sub-issue of
whether the energy price components properly reflect
the cost of biomass fuel supply (Issue 2.a.i., above).

(Emphasis added).

### a.    Motion to Upgrade Status

LOL filed a Motion to Upgrade Status, requesting that
the PUC allow it to intervene in the 2017 Docket as a party.[4]  In
support of its Motion to Upgrade Status, LOL stressed the fact
that the PUC had already "grant[ed] LOL participant status based
on [its] interests in the pending matter."  LOL also cited
previous PUC proceedings in which it was admitted as a party, and
stated that: (1) its Board of Directors "approved continuing to
intervene in energy dockets as a means of promoting sustainable
policies"; (2) LOL's members "are very deeply concerned about
climate change, biodiversity, and the spread of invasive
species"; (3) the only way to protect LOL's interest is by

---

[3]     Tawhiri Power, LLC (Tawhiri) and Hamakua Energy Partners (HEP)
were granted participant status in the 2017 Docket only with regard to Issue
2.b.  LOL, Tawhiri, and HEP all filed motions to intervene in the 2012 Docket,
which were denied.  They were instead granted limited participant status.

[4]     Although LOL did not cite HAR § 6-61-55 as the relevant authority
for its Motion to Upgrade Status, the motion nevertheless touches upon each of
the nine requirements for motions for intervention under HAR § 6-61-55(b)
(effective 1992 to 2018).  HAR § 16-601-55(b) (effective Jan. 1, 2019)
contains the same nine requirements.  See infra, note 22.

7

accessing "classified documents dealing with externalities"; (4) there are no other means available to protect LOL's interests; (5) the Consumer Advocate does not represent LOL's interests because it lacks the expertise to understand externalities;[5] (6) the agricultural expertise of LOL's vice president will assist in developing an evidentiary record; and (7) while the Consumer Advocate represents the interests of the general public, "LOL is concerned with a wider lens that encompasses externalities including social justice, environmental justice, climate justice, and [GHG] impacts."  In addition, LOL specifically expressed

---

[5]      Pursuant to Hawaiʻi Revised Statutes (HRS) § 269-51 (Supp. 2018) and HAR § 16-601-62 (effective Jan. 1, 2019), the Consumer Advocate represents the consumer and may participate as an ex officio party in Commission proceedings.

HRS § 269-51 provides:

> The executive director of the division of consumer advocacy shall be the consumer advocate in hearings before the public utilities commission.  The consumer advocate shall represent, protect, and advance the interests of all consumers, including small businesses, of utility services.
>
> The responsibility of the consumer advocate for advocating the interests of the consumer of utility services shall be separate and distinct from the responsibilities of the public utilities commission and those assistants employed by the commission.  The consumer advocate shall have full rights to participate as a party in interest in all proceedings before the public utilities commission.

HAR § 16-601-62 provides, in pertinent part:

> (a)   The consumer advocate is, ex officio, a party to any proceeding before the commission. . . .
>
> (b)   The consumer advocate shall further apprise the commission and the parties of record of any facts which relate to the protection or advancement of the consumer interest.

concern regarding the externalities associated with "acquiring bioenergy crops" from a specific area of the Big Island that already serves as a source for another biofuel facility.

The PUC issued Order No. 34651, denying LOL's motion. The PUC cited HAR § 6-61-55, specifically noting subsection (d),[6] and stated that "intervention is not a guaranteed right of a movant, but is a matter resting within the sound discretion of the commission, so long as that discretion is not exercised arbitrarily or capriciously." It also cited HAR § 6-61-56 (effective 1992-2018),[7] which sets forth the requirements for

---

[6] HAR § 6-61-55(d) (effective 1992-2018) provided that "Intervention shall not be granted except on allegations which are reasonably pertinent to and do not unreasonably broaden the issues already presented." HAR § 16-601-55(d) (effective Jan. 1, 2019) contains identical language. See infra note 22.

[7] HAR § 6-61-56 provided:

> (a) <u>The commission may permit participation without intervention. A person or entity in whose behalf an appearance is entered in this manner is not a party to the proceeding and may participate in the proceeding only to the degree ordered by the commission</u>. The extent to which a participant may be involved in the proceeding shall be determined in the order granting participation or in the prehearing order.
>
> (b) A person who has a limited interest in a proceeding may make an application to participate without intervention by filing a timely written motion in accordance with sections 6-61-15 to 6-61-24, section 6-61-41, and section 6-61-57.
>
> (c) The motion shall provide:
>
> > (1) A clear and concise statement of the direct and substantial interest of the applicant;

(continued...)

participation without intervention.  It stated:

> As was the case in [the 2012 Docket], upon review of the record, the commission continues to find that the concerns raised in LOL's Motion, which are identical to or mirror the concerns raised by LOL in its Motion to Intervene in [the 2012 Docket], provide insufficient basis to justify full intervention in this proceeding.  The commission finds that LOL has failed to demonstrate any additional interest or expertise sufficient to justify a change in its limited participant status granted on a conditional basis in Order No. 34554, and permanently established pursuant to Order No. 34597.

### b.    Information Requests

LOL filed several Information Requests (IRs), seeking information from HELCO, Hu Honua, and the Consumer Advocate regarding GHG emissions and other potential adverse environmental impacts of the Hu Honua facility.  In its response to LOL's IRs, HELCO acknowledged that GHGs would be emitted by equipment used

---

[7](...continued)

(2)    The applicant's position regarding the matter in controversy;

(3)    The extent to which the participation will not broaden the issues or delay the proceeding;

(4)    The extent to which the applicant's interest will not be represented by existing parties;

(5)    A statement of the expertise, knowledge or experience the applicant possesses with regard to the matter in controversy;

(6)    Whether the applicant can aid the commission by submitting an affirmative case; and

(7)    A statement of the relief desired.

(Emphasis added).  Other than the HAR section numbers it references, HAR 16-601-56 (effective Jan. 1, 2019) is identical to HAR 6-61-56 (effective 1992-2018).

to raze and transport trees, but stated that it had not quantified the amount of emissions. HELCO asserted that although carbon would be released into the atmosphere upon the combustion of trees in the facility, it would be recaptured upon the regrowth of the trees. In response to at least one of the IRs that LOL submitted to HELCO, HELCO objected and refused to respond, arguing that the information sought was "not relevant to and [was] outside the scope of LOL's authorized scope of limited participation[.]"

One of the IRs that LOL submitted to Hu Honua posed several questions regarding the quantity of wastewater that would be produced by the facility, the means by which it would be produced and managed, and the steps that would be taken to monitor and prevent ocean contamination. Hu Honua objected to this IR, as well as those focused on GHG emissions and climate change, stating that they were "not relevant or material to Issue Nos. 2.a.i or 2.b, which [were] the only issues for which the Commission authorized LOL's participation."

The Consumer Advocate responded to LOL that it had not completed an analysis of the impact the project would have on GHG emissions, and that any analysis should be comprehensive, including GHGs resulting from harvesting and transporting the feedstock. The Consumer Advocate further stated that it had not evaluated the need for a consultant to review GHGs and climate change in the instant proceeding.

11

### c.    Statements of Position

In its Statement of Position, LOL argued that Hu Honua's proposed facility was not in the public interest.  LOL further argued that Hu Honua's proposal failed to fully address climate change and the environmental impacts of the proposed operations.  LOL stated:

> Hu Honua plans to chop down existing trees for seven years, and then to rely on a rotational system of growing new trees and then chopping them down. Omitting any discussion of the fossil fuels used in the mechanization of growing, chopping, chipping, and transport, Hu Honua alleges that this operation is carbon neutral.

LOL also argued that the pricing of Hu Honua's proposal was not in the public interest when compared to lower-priced solar-based electricity proposals previously approved by the PUC.

In its Reply Statement of Position, Hu Honua argued that its facility "will make a significant contribution to the State's [Renewable Portfolio Standards (RPS),]" noting that "HELCO estimates that Hu Honua will increase RPS levels by 11% over the life of the PPA, and avoid the emission of hundreds of thousands of tons of $CO_2$."  Hu Honua asserted that "the estimated emissions due to transportation of fuel to the plant pale in comparison to the emissions reductions that will result from the displacement of fossil fuel[.]"  Hu Honua further stated that "biomass plants, like wind and solar plants, are renewable and carbon neutral to a reasonable approximation, and are therefore deemed fully renewable by applicable state law."

12

### d.    2017 Decision and Order

Without holding a hearing, the PUC entered the 2017 D&O approving the Amended PPA.  The PUC noted that comments in support of the Project focused on issues including the fulfillment of the RPS targets and energy resource self-reliance, while comments in opposition focused on issues including potential adverse environmental impacts, an expected rise in GHG emissions, and general objections to biomass as a fuel resource.

The PUC then summarized each party's position, citing HELCO's claims that approval of the Amended PPA would be reasonable due to, inter alia, the project's contribution to the State's RPS goals, the fact that the contract price for the Amended PPA is de-linked from fossil fuel pricing, and the assertion that "renewable energy provided by the Project could potentially save approximately 15,700 barrels of fuel per year, which over the term of the [Amended] PPA amounts to approximately 329,000 barrels of fuel oil saved."  The PUC also noted the following:

> HELCO asserted that the totality of circumstances should be considered when reviewing whether the purchased power costs are reasonable, . . . including governmental policies and objectives, <u>contributions towards RPS, reducing dependency on fossil fuels</u>, decreased price volatility, <u>de-linking energy costs from fossil fuel pricing</u>, realization of tax incentives, and community benefits.
>
> . . . .
>
> LOL asserted that "[t]he cost of biofuel includes both financial and non-financial components, which Hu Honua has failed to adequately address."  LOL asserted that

13

>the "non-financial components" include impacts on
>climate change and endangered species that were not
>explicitly quantified or monetized in HELCO's
>benefit/cost ratio.
>
>. . . .
>
>LOL is not in favor of commission approval of the
>[Amended] PPA, but focused its rationale on concerns
>outside of the scope of its limited participation,
>namely climate change and comparative pricing with
>other forms of energy.

(Emphases added).

It appears the PUC adopted HELCO's analysis of the biomass facility's economic and customer bill impact under the Amended PPA, stating, "[p]er HELCO, . . . the Project provides significant renewable energy-related benefits, primarily through its firm capacity and contribution to the State's RPS goals. For the island of Hawaii, with the Project, the RPS goal levels increase by approximately 11% over the 30-year life of the Project." The PUC also made the following findings and conclusions:

>[T]he commission finds that the Project will . . . add
>to the diversity of HELCO's existing portfolio of
>renewable energy resources.
>
>. . . .
>
>Consistent with [Hawai'i Revised Statutes (HRS)] §
>269-27.2(c)[(Supp. 2016)], the proposed pricing
>structure is delinked from fossil fuel pricing.
>
>. . . .
>
>[I]t appears that the addition of the Project may
>primarily displace fossil fuel generation resources.
>Accordingly, the commission anticipates that, based on
>the representations made in HELCO's [Power Supply
>Improvement Plan], this Project will accelerate the

retirement of fossil fuel plants[.]

(Emphases added).

The PUC addressed, inter alia, the following two issues: (2.a.i) whether the energy price components in the Amended PPA properly reflect the cost of biomass fuel supply; and (2.b) whether HELCO's purchase power arrangements under the Amended PPA are prudent and in the public interest. The PUC found the purchased power costs to be reasonable and that the arrangements under the Amended PPA were prudent and in the public interest. Accordingly, the PUC approved the Amended PPA, concluding that:

> HELCO has met its burden of proof in support of its request for the commission to approve the [Amended] PPA. The purchased power costs and arrangements set forth in the [Amended] PPA appear reasonable, prudent, in the public interest, and consistent with HRS chapter 269 in general, and HRS § 269-27.2(c), in particular. While the commission, in this instance, finds the pricing to be reasonable, the commission makes clear that its decision to approve the [Amended] PPA is not based solely on pricing, but includes other factors such as the State's need to limit its dependence on fossil fuels and mitigate against volatility in oil pricing.

(Emphases added).

## B.    Direct Appeal

LOL directly appealed the PUC's order denying LOL's Motion to Upgrade Status and the 2017 D&O to this court. See HRS § 269-15.51 (Supp. 2018) and HRS § 91-14 (2012 & Supp. 2018).

15

LOL presents three points of error:[8]  (1) the PUC was required, under HRS § 269-6(b) (Supp. 2016), to explicitly consider GHG emissions in determining whether the costs of the Amended PPA were reasonable, but failed to do so; (2) the PUC denied LOL due process to protect its right to a clean and healthful environment, as defined by HRS Chapter 269, by restricting its participation in the PUC proceedings; and (3) the PUC erred in denying LOL's Motion to Upgrade Status from "participant" to "intervenor."

## II.  STANDARDS OF REVIEW

### A.  Jurisdiction

"The existence of jurisdiction is a question of law that [the appellate court reviews] de novo under the right/wrong standard."  Captain Andy's Sailing, Inc., v. Dep't of Land & Nat. Res., 113 Hawaiʻi 184, 192, 150 P.3d 833, 841 (2006) (internal quotation marks and citation omitted).

### B.  Direct Appeal

Because this is a direct appeal from a decision of the PUC, the standard of review, as set forth in HRS § 91-14, is as follows:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the

---

[8]    LOL did not specifically challenge any findings of fact contained in the PUC's 2017 D&O in its Opening Brief.  "Findings of fact . . . that are not challenged on appeal are binding on the appellate court."  Bremer v. Weeks, 104 Hawaiʻi 43, 63, 85 P.3d 150, 170 (2004) (citations omitted).

16

substantial rights of the petitioners may have been
prejudiced because the administrative findings,
conclusions, decisions, or orders are:

(1)     In violation of constitutional or statutory
        provisions;

(2)     In excess of the statutory authority or
        jurisdiction of the agency;

(3)     Made upon unlawful procedure;

(4)     Affected by other error of law;

(5)     Clearly erroneous in view of the reliable,
        probative, and substantial evidence on the whole
        record; or

(6)     Arbitrary, or capricious, or characterized by
        abuse of discretion or clearly unwarranted
        exercise of discretion.

HRS § 91-14(g).

Conclusions of law are reviewed de novo, pursuant to
subsections (1), (2) and (4); questions regarding
procedural defects are reviewable under subsection
(3); findings of fact (FOF) are reviewable under the
clearly erroneous standard, pursuant to subsection
(5), and an agency's exercise of discretion is
reviewed under the arbitrary and capricious standard,
pursuant to subsection (6). Save Diamond Head Waters
LLC, 121 Hawaiʻi [16,] 24, 211 P.3d [74,] 82 [(2009)].
Mixed questions of law and fact are "'reviewed under
the clearly erroneous standard because the conclusion
is dependent upon the facts and circumstances of the
particular case.'" Id. at 25, 211 P.3d at 83 (quoting
Del Monte Fresh Produce (Haw.), Inc. v. Int'l
Longshore & Warehouse Union, 112 Hawaiʻi 489, 499, 146
P.3d 1066, 1076 (2006)).

A court reviewing the decision of an agency should
ensure that the "agency . . . make its findings
reasonably clear. The parties and the court should
not be left to guess . . . the precise finding of the
agency." In re Water Use Permit Applications, 94
Hawaiʻi 97, 157, 9 P.3d 409, 469 (2000) ("Waiahole I")
(quoting In re Kauai Elec. Div. of Citizens Utilities
Co., 60 Haw. 166, 183, 590 P.2d 524, 537 (1978)). An
agency's findings should be "sufficient to allow the

reviewing court to track the steps by which the agency reached its decision." <u>Kilauea Neighborhood Ass'n v. Land Use Comm'n</u>, 7 Haw. App. 227, 230, 751 P.2d 1031, 1034 (1988)[; <u>see</u>] <u>also</u> <u>In re Wai'ola O Moloka'i, Inc.</u>, 103 Hawai'i 401, 432, 83 P.3d 664, 695 (2004) (explaining that any presumption of validity, given to an agency's decision, "presupposes that the agency has grounded its decision in reasonably clear" findings of fact and conclusions of law).

<u>Kauai Springs, Inc. v. Planning Comm'n of Cty. of Kauai</u>, 133 Hawai'i 141, 164, 324 P.3d 951, 974 (2014).

## C.  Constitutional Law

"We review questions of constitutional law de novo, under the right/wrong standard." <u>Jou v. Dai-Tokyo Royal State Ins. Co.</u>, 116 Hawai'i 159, 164–65, 172 P.3d 471, 476–77 (2007) (quoting <u>Onaka v. Onaka</u>, 112 Hawai'i 374, 378, 146 P.3d 89, 93 (2006)) (internal quotation marks omitted).

### III.  DISCUSSION

## A.  Jurisdiction

This court must determine, as a threshold matter, whether it has jurisdiction over LOL's appeal. <u>Pub. Access Shoreline Haw. by Rothstein v. Haw. Cty. Planning Comm'n by Fujimoto</u>, 79 Hawai'i 425, 431, 903 P.2d 1246, 1252 (1995) (quoting <u>Pele Def. Fund v. Puna Geothermal Venture</u>, 77 Hawai'i 64, 67, 881 P.2d 1210, 1213 (1994)). Hu Honua and HELCO argue that this court lacks jurisdiction because LOL's appeal of the PUC's 2017 D&O constitutes an improper collateral attack on the PUC's 2012 D&O. Additionally, Hu Honua, HELCO, and the PUC argue that this court lacks jurisdiction because LOL's appeal does not

18

arise from a contested case and LOL failed to comply with the applicable agency rules by not requesting a contested case hearing.

As set forth below, LOL's appeal is not a collateral attack on the PUC's 2012 D&O. LOL has appealed the PUC's 2017 D&O to directly challenge its validity, rather than to indirectly impeach the validity of the PUC's 2012 D&O. Furthermore, the requirements for judicial review under HRS § 91-14(a) – a contested case hearing, finality, and compliance with agency rules – have been satisfied. The PUC's 2017 Docket was a contested case hearing because a hearing was required by constitutional due process in order to consider the impacts of approving the Amended PPA on LOL's right to a clean and healthful environment, as defined by HRS Chapter 269, and such a hearing would have determined the rights, duties, and privileges of HELCO. It is undisputed that the 2017 D&O is a final decision of the PUC. Finally, LOL followed the applicable agency rules, as it was involved in the contested case as a participant in the 2017 Docket and the PUC's administrative rules do not require a request for a contested case hearing as a prerequisite to judicial review. We therefore have jurisdiction to consider the merits of LOL's appeal.

1. **Collateral Attack**

"A collateral attack[, as opposed to a direct attack,] is an attempt to impeach a judgment or decree in a proceeding not

19

instituted for the express purpose of annulling, correcting or modifying such judgment or decree." Kapiolani Estate v. Atcherly, 14 Haw. 651, 661 (1903) (citations and internal quotation marks omitted). The ICA has observed that "the collateral attack doctrine is implicated when an independent suit seeks to impeach a judgment entered in a prior suit." Smallwood v. City and Cty. of Honolulu, 118 Hawai'i 139, 150, 185 P.3d 887, 898 (App. 2008). This court has similarly stated that "[a]ppellate courts in Hawai'i have typically only applied the collateral attack doctrine in situations in which a second lawsuit has been initiated challenging a judgment or order obtained from a prior, final proceeding." In re Thomas H. Gentry Revocable Tr., 138 Hawai'i 158, 169 n.5, 378 P.3d 874, 885 n.5 (2016) (citation omitted).

> The party asserting that an action constitutes an impermissible collateral attack on a judgment must establish that: (1) a party in the present action seeks to avoid, defeat, evade, or deny the force and effect of the prior final judgment, order, or decree in some manner other than a direct post-judgment motion, writ, or appeal; (2) the present action has an independent purpose and contemplates some other relief or result than the prior adjudication; (3) there was a final judgment on the merits in the prior adjudication; and (4) the party against whom the collateral attack doctrine is raised was a party or is in privity with a party in the prior action.

Smallwood, 118 Hawai'i at 150, 185 P.3d at 898.

As set forth below, LOL's appeal is a direct attack of the PUC's 2017 D&O, not a collateral attack on the PUC's 2012 D&O.

20

The first Smallwood element requires a showing that "a party in the present action seeks to avoid, defeat, evade, or deny the force and effect of the prior final judgment, order, or decree in some manner other than a direct post-judgment motion, writ, or appeal."  118 Hawai'i at 150, 185 P.3d at 898 (emphases added).  "If an appeal is taken from a judgment, . . . the attack is obviously direct, the sole object of the proceeding being to deny and disprove the apparent validity of the judgment." Kapiolani Estate, 14 Haw. at 661.  Rather than attacking the validity of the PUC's 2012 D&O, LOL's appeal was instituted for the express purpose of denying the force and effect the PUC's 2017 D&O.  Thus, the first Smallwood element is not satisfied and LOL's appeal cannot be construed as a collateral attack. See Kapiolani Estate, 14 Haw. at 661 ("A collateral attack is an attempt to impeach a judgment or decree in a proceeding not instituted for the express purpose of annulling, correcting or modifying such judgment or decree.") (emphasis added).

Hu Honua and HELCO argue that, even if LOL's challenge appears to be a direct appeal of the PUC's 2017 D&O, it functions as a collateral attack on the PUC's 2012 D&O.  Hu Honua and HELCO contend that the primary purpose of LOL's appeal is to force the PUC to consider the effect of the State's reliance on fossil fuels on GHG emissions and climate change.  However, they argue, consideration of GHGs was not within the scope of the PUC's final statement of issues in the 2017 Docket.  According to Hu Honua

21

and HELCO, the 2017 Docket only involved increasing the term of the Original PPA and revisions to the contract price and milestone events, which do not directly relate to the effect of the State's reliance on fossil fuels on GHG emissions or climate change. Hu Honua and HELCO therefore contend that, to the extent the PUC was required to consider the effect of the State's reliance on fossil fuels on GHG emissions and climate change, "it did so only in the 2012 Docket." Because LOL failed to directly and timely challenge the 2012 D&O, Hu Honua and HELCO argue that LOL's appeal is an improper and untimely attempt to raise the PUC's failure to address GHGs in the 2012 D&O.

As discussed further infra, a majority of this court recently determined that "HRS § 269-6(b)'s requirement to reduce reliance on fossil fuels and to consider [GHG] emissions applies to the fulfillment of all of the [PUC's] duties." In re Application of Maui Elec. Co. (MECO), 141 Hawai'i 249, 263, 408 P.3d 1, 15 (2017) (citing HRS § 269-6(b)). LOL was entitled to appeal the PUC's 2017 D&O due to the PUC's alleged failure to perform statutory and constitutional duties. Hu Honua and HELCO's argument that the collateral attack doctrine precludes this court from exercising appellate jurisdiction over LOL's appeal because the PUC's consideration of GHGs was outside the scope of the 2017 Docket is therefore without merit.

Accordingly, this court's appellate jurisdiction is not precluded by the collateral attack doctrine.

22

## 2.   Contested Case

PUC decisions are appealable to this court pursuant to HRS § 269-15.51, which provides, in relevant part:

> Any other law to the contrary notwithstanding, including chapter 91, any contested case under this chapter shall be appealed from a final decision and order or a preliminary ruling that is of the nature defined by section 91-14(a) upon the record directly to the supreme court for final decision. Only a person aggrieved in a contested case proceeding provided for in this chapter may appeal from the final decision and order or preliminary ruling.

Judicial review over an agency appeal is authorized by HRS § 91-14(a)[9] when the following requirements have been met:

> [F]irst, the proceeding that resulted in the unfavorable agency action must have been a contested case hearing . . . ; second, the agency's action must represent a final decision or order, or a preliminary ruling such that deferral of review would deprive the claimant of adequate relief; third, the claimant must have followed the applicable agency rules and, therefore, have been involved in the contested case; and finally, the claimant's legal interests must have been injured — i.e., the claimant must have standing to appeal.

MECO, 141 Hawai'i at 258, 408 P.3d at 10 (quoting Kilakila 'O Haleakala v. Bd. of Land & Nat. Res., 131 Hawai'i 193, 200, 317 P.3d 27, 34 (2013)).

Accordingly, there are three jurisdictional

---

[9]   HRS § 91-14(a) provides, in relevant part: Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law.

23

requirements for judicial review over an agency appeal: (1) a contested case hearing, (2) finality, and (3) compliance with agency rules. Id. Hu Honua, HELCO, and the PUC argue that this court lacks jurisdiction over LOL's appeal because the appeal does not arise from a contested case and LOL failed to comply with the applicable agency rules by not requesting a contested case hearing.[10]

### a. The Proceeding Was a Contested Case Hearing

"A contested case hearing is one that is (1) required by law and (2) determines the rights, duties, and privileges of specific parties." MECO, 141 Hawai'i at 258, 408 P.3d at 10 (internal quotation marks omitted) (citing Kilakila, 131 Hawai'i at 200, 317 P.3d at 34). As set forth below, the PUC's 2017 Docket was a contested case hearing because a hearing was required by law that would have determined the rights, duties, and privileges of HELCO.

### i. "Required by Law"

"In order for an administrative agency hearing to be required by law, it may be required by (1) agency rule, (2) statute, or (3) constitutional due process." Id. (internal quotation marks omitted) (citing Kilakila, 131 Hawai'i at 200, 317 P.3d at 34). LOL contends that a contested case hearing was

---

[10] The parties do not dispute that the PUC's 2017 D&O was a final decision or order for the purpose of satisfying the requirements for judicial review of an agency appeal. Accordingly, that requirement is not addressed further.

24

required under HRS §§ 269-16 (Supp. 2018) and 269-27.2 (2007 &
Supp. 2018), and constitutional due process.  We hold that
although a hearing was not required by statute, one was required
pursuant to constitutional due process.

### (A)  HRS § 269-16(b)

HRS § 269-16(b) requires the PUC to conduct a contested
case hearing whenever a utility seeks an increase in rates, but
specifically exempts rate adjustments "established pursuant to an
automatic rate adjustment clause previously approved by the
commission[.]"[11]  HAR § 6-60-6 (effective June 19, 1981)
similarly provides that automatic rate adjustment clauses that
apply to fuel and purchased energy--or fuel adjustment

---

[11]     HRS § 269-16(b) provides, in relevant part:

> No rate, fare, charge, classification, schedule, rule,
> or practice, other than one established pursuant to an
> automatic rate adjustment clause previously approved
> by the commission, shall be established, abandoned,
> modified, or departed from by any public utility,
> except after thirty days' notice to the commission as
> prescribed in section 269-12(b), and prior approval by
> the commission for any increases in rates, fares, or
> charges. . . .  A contested case hearing shall be held
> in connection with any increase in rates, and the
> hearing shall be preceded by a public hearing as
> prescribed in section 269-12(c), at which the
> consumers or patrons of the public utility may present
> testimony to the commission concerning the increase.
> The commission, upon notice to the public utility,
> may:
>
> . . . .
>
> (2)   After a hearing, by order:
>
>    . . . .
>
>    (G)   Regulate its financial transactions[.]

(Emphases added).

25

clauses--do not require a hearing.[12]  Thus, not only are
automatic rate adjustment clauses exempted from HRS § 269-16(b)'s
hearing requirement, they are also defined by the relevant agency
rule as provisions that allow for rate changes without a prior
hearing.

The PUC approved the Amended PPA pursuant to, in part,
HAR § 6-60-6 (effective June 19, 1981).  In so doing, it
authorized HELCO to include energy power purchase costs in its
Energy Cost Adjustment Clause (ECAC) and to include non-energy
purchased power costs in its Purchased Power Adjustment Clause
(PPAC).  According to the 2017 D&O, HELCO's ECAC and PPAC are
"fuel adjustment clauses" under HAR § 6-60-6.[13]  The PUC

_____

[12]    The utility's rate schedules may include <u>automatic rate
adjustment clauses</u>, only for those clauses previously
approved by the commission.  Upon effective date of
this Chapter, any fuel adjustment clause submitted for
commission approval shall comply with the following
standards:

(1)    "Fuel adjustment clause" means a provision of a
rate schedule which provides for increases or
decreases or both, <u>without prior hearing</u>, in
rates reflecting increases or decreases or both
in costs incurred by an electric or gas utility
<u>for fuel and purchased energy</u> due to changes in
the unit cost of fuel and purchased energy.

(2)    No changes in fuel and purchased energy costs
may be included in the fuel adjustment clause
unless the contracts or prices for the purchase
of such fuel or energy have been previously
approved or filed with the commission.

HAR § 6-60-6 (emphases added).

[13]    The Amended PPA defines "Energy Cost Adjustment Clause" as:

[HELCO]'s cost recovery mechanism for fuel and
purchased energy costs approved by the PUC in

(continued...)

26

specifically noted that HAR § 6-60-6 "generally governs the propriety of fuel adjustment clauses[,]" and stated in its Findings and Conclusions that:

> [I]n the Underlying [2012] Decision and Order regarding the Original PPA, the commission found it "reasonable to authorize recovery of the purchased energy charges through [HELCO's] ECAC, and to recover the non-energy purchased power costs (including the related revenue taxes) through [HELCO's] PPAC, to the extent that such costs are not included in base rates." Because the energy and capacity payments in the [Amended PPA], as in the Original PPA, continue to not be included in another cost recovery mechanism, and given the above findings concerning pricing under the [Amended PPA], the commission authorizes the same recovery under the [Amended PPA].

In MECO, we considered whether a hearing was required under HRS § 269-16(b) before the PUC could approve Maui Electric's request to recover costs through its existing ECAC. MECO, 141 Hawaiʻi at 259-60, 408 P.3d at 11-12. In making our determination that a hearing was not required by HRS § 269-16(b), we stated the following:

> [T]he Commission authorized Maui Electric to recover charges for purchased energy under the Agreement through Maui Electric's existing energy cost adjustment clause. There is nothing in the record indicating that Maui Electric's energy cost adjustment clause was not previously approved by the Commission

---

[13](...continued)
conformance with [HAR] § 6-60-6 whereby the base electric energy rates charged to retail customers are adjusted to account for fluctuations in the costs of fuel and purchased energy or such successor provision that may be established from time to time.

"Purchased Power Adjustment Clause" is defined as "[t]he Purchased Power Adjustment Clause approved by the PUC in Decision and Order No. 30168 in Docket No. 2009-0164 on February 8, 2012."

> or that the Commission's decision revised the existing
> adjustment clause. Additionally, the record does not
> suggest that the use of the fuel adjustment clause in
> this case would cover anything other than increases or
> decreases in the unit cost of purchased energy
> determined by the last rate case proceeding for the
> utility. See HAR § 6-60-6(3).

Id.

Similarly here, the PUC authorized HELCO to recover charges for purchased power through its existing ECAC and PPAC. The record indicates that these adjustment clauses were previously approved and were not revised by the PUC's 2017 D&O. Furthermore, the record does not suggest that the adjustment clauses would cover anything other than changes in the unit cost of purchased power determined by the last rate case proceeding.

Accordingly, because the rate adjustments implicated by the Amended PPA were established pursuant to automatic adjustment clauses previously approved by the PUC, the PUC was not required to hold a contested case hearing under HRS § 269-16(b) prior to approving the Amended PPA.

### (B) HRS § 269-27.2(d)

Pursuant to HRS § 269-27.2(d), the PUC may only allow a public utility to impose an interim increase in rates to recover payments made to "nonfossil fuel producers for firm capacity and related revenue taxes" after an evidentiary hearing.[14] As

---

[14] HRS § 269-27.2(d) provides, in pertinent part:
Upon application of a public utility that supplies electricity to the public, and notification of its customers, the commission, after an evidentiary

(continued...)

28

discussed above, in approving the Amended PPA, the PUC authorized HELCO to include energy power purchase costs and non-energy purchased power costs in its ECAC and PPAC, respectively, to the extent that such costs were not included in its base rates. However, HELCO's ECAC and PPAC are fuel adjustment clauses specifically exempt from hearing requirements and do not constitute an "interim increase in rates" for the purposes of HRS § 269-27.2(d).

In MECO, we similarly considered whether a hearing was required under HRS § 269-27.2(d). MECO, 141 Hawaiʻi at 259, 408 P.3d at 11. In determining that a hearing was not required by HRS § 269-27.2(d), we stated that:

> Sierra Club has not argued that the [PUC]'s decision authorized Maui Electric to impose an interim increase in rates for the purpose of recovering payments for firm capacity, nor has Sierra Club argued that Maui Electric ever sought permission to do so. Indeed, the record indicates that one of the features of the Agreement was to eliminate the capacity payments that Maui Electric was paying to HC & S under the existing agreement. Accordingly, the requirement of a hearing provided for in HRS § 269-27[.2](d) is not applicable to the Application in this case.

Id.

As in MECO, LOL does not argue that the PUC authorized an interim increase in HELCO's base rates when it approved the

_____

[14](...continued)
        hearing, may allow payments made by the public utility to nonfossil fuel producers for firm capacity and related revenue taxes to be recovered by the public utility through an interim increase in rates[.]

(Emphases added).

29

Amended PPA, or that HELCO sought permission to impose such an increase. As such, the PUC was not required to hold a contested case hearing under HRS § 269-27.2(d) prior to approving the Amended PPA.

### (C) Constitutional Due Process

LOL argues that a contested case hearing was required by constitutional due process prior to the PUC's approval of the Amended PPA. As set forth below, we agree.

This court engages in a two-step inquiry when evaluating claims of a due process right to a hearing: "(1) is the particular interest which [the] claimant seeks to protect by a hearing 'property' within the meaning of the due process clauses of the federal and state constitutions, and (2) if the interest is 'property,' what specific procedures are required to protect it." Sandy Beach Def. Fund v. City Council of Honolulu, 70 Haw. 361, 376, 773 P.2d 250, 260 (1989) (citing Aquiar v. Haw. Hous. Auth., 55 Haw. 478, 495, 522 P.2d 1255, 1266 (1974)).

Accordingly, to determine whether LOL was entitled to a contested case hearing pursuant to constitutional due process, we must first determine whether LOL possesses "an interest which qualifies as 'property' within the meaning of the constitution." Id. If LOL does possess such a property interest, we must then consider whether a contested case hearing was required to protect that interest. Id.

## (1) Constitutionally Cognizable
## Property Interest

"[A] protected property interest exists in a benefit — tangible or otherwise — to which a party has a legitimate claim of entitlement."  MECO, 141 Hawaiʻi at 260, 408 P.3d at 12 (internal quotation marks omitted) (citing Sandy Beach Def. Fund, 70 Haw. at 377, 773 P.2d at 260).  This court has explained that:

> The legitimate claims of entitlement that constitute property interests are not created by the due process clause itself.  Instead, "they are created and their dimensions are defined by existing rules or understanding that stem from an independent source such as state law — rules or understanding that secure certain benefits and that support claims of entitlement to those benefits."

Id. (quoting In re ʻĪao Ground Water Mgmt. Area High-Level Source Water Use Permit Applications, 128 Hawaiʻi 228, 241, 287 P.3d 129, 142 (2012)).

LOL argues that it was entitled to due process to protect its constitutional right to a clean and healthful environment provided by article XI, section 9 of the Hawaiʻi Constitution and HRS Chapter 269.  Article XI, section 9 provides:

> Each person has the right to a clean and healthful environment, as defined by laws relating to environmental quality, including control of pollution and conservation, protection and enhancement of natural resources.  Any person may enforce this right against any party, public or private, through appropriate legal proceedings, subject to reasonable limitations and regulation as provided by law.

In MECO, this court similarly considered whether the

31

PUC violated Sierra Club's due process rights by approving a power purchase agreement between a utility company and a producer of electricity without holding a contested case hearing to consider the environmental impacts of approving the agreement. Id. at 260-65, 408 P.3d at 12-17. This court recognized that Sierra Club's interest in its right to a clean and healthful environment, as defined by laws relating to environmental quality, is a property interest protected by due process, as it is a substantive right guaranteed by the Hawaiʻi Constitution. Id. at 260-61, 408 P.3d at 12-13.

This court then determined that "HRS Chapter 269 is a law relating to environmental quality that defines the right to a clean and healthful environment under article XI, section 9 by providing that express consideration be given to reduction of [GHG] emissions in the decision-making of the Commission." Id. at 264, 408 P.3d at 16. This court held that Sierra Club's assertion of a right to a clean and healthful environment, as defined by HRS Chapter 269, therefore established a protectable property interest under article XI, section 9 and HRS Chapter 269. Id.

Like the appellant in MECO, LOL seeks to protect its property interest in a clean and healthful environment, as defined by HRS Chapter 269. LOL stated in the 2017 Docket that:

> Life of the Land is a non-profit Hawaii-based organization. Our members are very deeply concerned about climate change, biodiversity, and the spread of

invasive species.  Life of the Land believes that the efforts to protect our archipelago from the ravages of climate change, and the introduction of alien species has not been adequately protected and funded by legislative actions.

LOL asserts that "its members are located in Hawai'i and are directly concerned with preventing climate change impacts, biodiversity, and the spread of invasive species, all of which are affected by GHG emissions, as well as other environmental and public interest impacts of [the] PUC's decisionmaking on the [Amended PPA]."  Consequently, pursuant to article XI, section 9 of the Hawai'i Constitution and HRS Chapter 269, as interpreted by this court in MECO, LOL has shown a constitutionally cognizable property interest in this case.

### (2)   A Contested Case Hearing was Required

Having determined that LOL has demonstrated a protected property interest in a clean and healthful environment as defined by HRS Chapter 269, "we next consider what procedures due process requires in this case."  MECO, 141 Hawai'i at 265, 408 P.3d at 17.  When determining the procedures required to comply with constitutional due process, we consider the following three factors:  "(1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional

33

procedural safeguards would entail." Sandy Beach Def. Fund, 70 Haw. at 378, 773 P.2d at 261 (citations omitted). Upon consideration of each of these factors, we conclude that a contested case hearing was required.

First, the private interest to be affected is LOL's right to a clean and healthful environment, which "includes the right that explicit consideration be given to reduction of [GHG] emissions in Commission decision-making, as provided for in HRS Chapter 269." MECO, 141 Hawai'i at 265, 408 P.3d at 17. The Amended PPA involves the construction and operation of a biomass combustion facility by Hu Honua, and reliance on the facility by HELCO for an extended term of thirty years. As in MECO, as part of the 2017 Docket, the PUC was asked to consider the reasonableness of the energy charges implicated by the Amended PPA, and to determine whether the arrangement was prudent and in the public interest. This "would necessarily include an evaluation of the hidden and long-term costs of the activities" of the Hu Honua facility. Id. at 266, 408 P.3d at 18. Because the PUC's determinations of these issues would require consideration of the level of GHG emissions generated by the Hu Honua facility, LOL's right to a clean and healthful environment, as defined by HRS Chapter 269, was directly affected by the PUC's approval of the Amended PPA under MECO.

Further, the PUC's 2017 D&O concluded that the Amended PPA was "consistent with HRS chapter 269" and was approved based

in part on "the State's need to limit its dependence on fossil fuels and mitigate against volatility in oil pricing."  The PUC's decision thus implicated LOL's constitutional right to a clean and healthful environment, as defined by HRS Chapter 269. Accordingly, the PUC's approval of the Amended PPA under the terms of the 2017 D&O adversely affected LOL's private interest.

Second, the risk of erroneous deprivation is high in this case, absent the protections provided by a contested case hearing.  Consistent with public comments in opposition to the project, LOL posits that the PUC's approval of the Amended PPA could have adverse environmental impacts.  Yet, the restricted scope of the 2017 Docket prevented LOL from addressing these potential impacts.  See MECO, 141 Hawai'i at 266, 408 P.3d at 18 (risk of erroneous deprivation of Sierra Club's interest was high due to potential impact on air quality and absence of opportunities to be heard concerning electricity producer's performance under the agreement).

Finally, regarding the governmental interest, the burden of affording LOL a contested case hearing is slight because the PUC is already statutorily required to consider the long-term effects of its decisions.  See id. (affording Sierra Club a hearing would not unduly burden the PUC in light of its statutory duty to consider the long-term effects of its decisions).

Accordingly, and consistent with this court's

35

conclusion in <u>MECO</u>, a hearing conducted by the PUC was required by constitutional due process to protect LOL's right to a clean and healthful environment, as defined by HRS Chapter 269.  <u>Id.</u> at 269, 408 P.3d at 21.

### ii.  "Rights, Duties, and Privileges"

A contested case hearing is one that is (1) required by law and (2) determines the rights, duties, and privileges of specific parties.  <u>MECO</u>, 141 Hawaiʻi at 258, 408 P.3d at 10 (citing <u>Kilakila</u>, 131 Hawaiʻi at 200, 317 P.3d at 34) (internal quotation marks omitted).  Having determined that a contested case hearing was required by constitutional due process, the question becomes whether the 2017 Docket, in which the PUC approved the Amended PPA, constituted a contested case hearing. We conclude that the 2017 Docket <u>was</u> a contested case hearing because the hearing required by law would have determined HELCO's rights, duties, and privileges.

This court has explained that:

> HRS § 91-1 [Supp. 2018] does not contain the requirement that the hearing be a "trial-type evidentiary hearing" or that the hearing exhibit a particular level of "adversarial" quality.  Rather, . . . there are only two requirements for a hearing to be regarded as a contested case hearing: (1) that the hearing be required by law and (2) that the hearing determine the rights, duties, or privileges of specific parties.

<u>E & J Lounge Operating Co. v. Liquor Comm'n of City & Cty. of Honolulu</u>, 118 Hawaiʻi 320, 333, 189 P.3d 432, 445 (2008).

In <u>Kilakila</u>, the Board of Land and Natural Resources

(BLNR) approved an application submitted by the University of Hawai'i (UH) to permit construction of astronomy facilities near the summit of Haleakalā on Maui.  131 Hawai'i 193, 317 P.3d 27. The circuit court dismissed an appeal of the BLNR's decision for lack of jurisdiction under HRS § 91-14 because no formal contested case hearing had been held.  The ICA affirmed.  <u>Id.</u> at 196, 317 P.3d at 30.  This court determined that, although no formal contested case hearing occurred, the BLNR proceedings that resulted in the granting of UH's application constituted a contested case hearing.  <u>Id.</u> at 200-02, 317 P.3d at 34-36.

We first determined that UH's application "necessitated a hearing by law - i.e., by the administrative rules governing [Department of Land and Natural Resources] and BLNR."  <u>Id.</u> at 202, 317 P.3d at 36.  We then stated the following regarding the "rights, duties, and privileges" requirement of a contested case hearing:

> In this case, no formal contested case hearing was
> actually held before the BLNR voted to grant the
> permit in this case, so <u>the question becomes whether a</u>
> <u>formal hearing would have determined — or whether the</u>
> <u>proceedings that did take place determined — the</u>
> <u>"rights, duties, and privileges of specific parties."</u>
> The inquiry here is "directed at the party whose
> application was under consideration."  Thus, we focus
> on the rights, duties, and privileges of UH.
>
> . . . .  UH's proposed project involves construction
> of a substantial complex of astronomy facilities on
> conservation district land. . . .  UH could not
> legally commence that construction without first
> submitting an application for a permit and having that
> application reviewed and approved by BLNR.  Approval,
> including any conditions attached thereto, or denial

37

> of the application clearly implicates whether UH would or would not be able to engage in the requested use of building astronomy facilities at the telescope project site. Thus, a formal contested case hearing approving o[r] denying UH's application would have determined UH's rights, duties, or privileges with regard to the project. <u>Even in the absence of a formal contested case hearing, we point out that the proceedings that otherwise took place, including the vote to grant the permit, in fact did determine UH's rights, duties, and privileges.</u>

<u>Id.</u> (emphases added) (citations omitted).

Because approval of UH's permit was required before it could construct astronomy facilities at the project site, the proceedings that took place determined UH's rights, duties, and privileges. <u>Id.</u> We therefore concluded that, although no formal contested case hearing was conducted, the BLNR proceedings nevertheless constituted a contested case hearing within the meaning of HRS § 91-14. <u>Id.</u>

Similar to the BLNR proceedings at issue in <u>Kilakila</u>, no formal contested case hearing was held before the PUC approved the Amended PPA in the 2017 D&O. We must therefore address "whether a formal hearing would have determined - or whether the proceedings that did take place determined - the 'rights, duties, and privileges'" of HELCO. <u>Kilakila</u>, 131 Hawaiʻi at 202, 317 P.3d at 36 (noting that the inquiry is "directed at the party whose application was under consideration") (citation and quotation marks omitted).

Pursuant to HRS § 269-27.2(c), HELCO and Hu Honua's Amended PPA would be of no force and effect without approval by

38

the PUC.  Thus, had the PUC held a formal contested case hearing to determine whether the Amended PPA should be approved or rejected, that hearing would have determined the rights, duties, and privileges of HELCO.  Even in the absence of a formal contested case hearing, the proceedings that took place in the 2017 Docket resulted in the PUC's approval of the Amended PPA, and therefore did in fact determine HELCO's rights, duties, and privileges.  Accordingly, the PUC's proceedings in the 2017 Docket constituted a contested case hearing within the meaning of HRS § 91-14.

### b.  LOL Followed Agency Rules and Was Involved in the Contested Case

Judicial review over an agency appeal under HRS § 91-14 is only available where the claimant "followed the applicable agency rules and, therefore, [was] involved in the contested case."  MECO, 141 Hawai'i at 258, 408 P.3d at 10 (quoting Kilakila, 131 Hawai'i at 200, 317 P.3d at 34).  Hu Honua, HELCO, and the PUC argue that LOL was not entitled to a contested case hearing because it failed to request such a hearing.  As set forth below, this argument is without merit, as LOL was not required to request a contested case hearing.

### i.  A Request for a Contested Case Hearing Was Not Required Pursuant to Administrative Rule

Hu Honua argues that LOL was required to request a contested case hearing pursuant to HAR §§ 6-61-74 (effective

39

1992-2018) and 6-61-55.[15]  However, the PUC's administrative rules do not contain such a requirement.  HAR § 6-61-74 provided the substantive requirements for applications and petitions to the PUC generally, and HAR § 6-61-55 described the substance of an application to intervene as a party in a PUC proceeding. Neither of these rules, which remain effective in HAR title 16, chapter 601, requires a party to request a contested case hearing.  Moreover, no other rule that governs the rules of

---

[15]     HAR § 6-61-74 provided:

All applications and petitions shall:

(1)     State clearly and concisely the authorization or relief sought;

(2)     Cite the appropriate statutory provision or other authority under which commission authorization or relief is sought; and

(3)     In addition to specific requirements for particular types of applications (see subchapters 7 to 10), state the following:

    (A)     The applicant's legal name and location of principal place of business, and, if a corporation, trust, association, or other organization, the state under whose laws the applicant was organized;

    (B)     The name, title, and address of the person to whom correspondence or communications in regard to the application are to be addressed.  Notices, orders, and other documents shall be served upon the person named, and that service shall be deemed to be service upon the applicant; and

    (C)     If ex parte action or relief pending full hearing is sought, the necessity or emergency justifying the requested action.

See infra note 22.  HAR § 16-601-74 (effective Jan. 1, 2019) provides identical requirements.

practice and procedure before the PUC imposes such a requirement. Furthermore, it is undisputed that LOL was involved in the PUC's proceeding as a participant. Accordingly, judicial review over LOL's appeal is not precluded on this basis.

In contrast, HAR Chapter 13-1, governing the rules of practice and procedure before the Department of Land and Natural Resources, contains a requirement that a claimant "request a contested case and petition the board to hold a contested case hearing." HAR § 13-1-29(a) (effective Feb. 27, 2009).[16] This court has recognized that "HAR § 13-1-29 is the applicable agency rule delineating the specific procedures for requesting a contested case hearing."[17] <u>Hui Kakoʻo Aina Hoʻopulapula v. Bd. of</u>

---

[16]     HAR § 13-1-29(a) provides:

> On its own motion, the board may hold a contested case hearing. Others must both request a contested case and petition the board to hold a contested case hearing. An oral or written request for a contested case hearing must be made to the board no later than the close of the board meeting at which the subject matter of the request is scheduled for board disposition. <u>An agency or person so requesting a contested case must also file (or mail a postmarked) written petition with the board for a contested case no later than ten calendar days after the close of the board meeting at which the matter was scheduled for disposition</u>. For good cause, the time for making the oral or written request or submitting a written petition or both may be waived.

(Emphasis added).

[17]     HAR § 13-1-29 has been amended slightly since this court decided <u>Hui Kakoʻo Aina Hoʻopulapula</u>. When the case was decided, HAR § 13-1-29(a) stated:

> A hearing on a contested matter may be requested by the board on its own motion or upon the written

(continued...)

41

<u>Land & Nat. Res.</u>, 112 Hawaiʻi 28, 40, 143 P.3d 1230, 1242 (2006), <u>abrogated on other grounds by Tax Found. of Hawaiʻi v. State</u>, SCAP-16-462, 2019 WL 1292286 (Haw. Mar. 21, 2019).  We noted that the appellants had made oral requests for a contested case hearing prior to the close of a BLNR meeting, but had failed to subsequently submit a written petition to the BLNR requesting a contested case hearing.  <u>Id.</u>  We thus determined that "inasmuch as the DLNR had properly promulgated specific procedures for a contested case hearing . . . and the Appellants failed to follow the requisite procedures, there was no contested case from which the Appellants could appeal, pursuant to HRS § 91-14(a)."  <u>Id.</u> at 41, 143 P.3d at 1243.

In contrast, the PUC's administrative rules do not require claimants to request a contested case hearing.  Thus, LOL did not fail to adhere to the applicable agency rules in seeking judicial review of its agency appeal without requesting a

---

[17](...continued)
> petition of any government agency or any interested person who then properly qualifies to be admitted as a party.  An oral or written request for a contested case hearing must be made by the close of the public hearing (if one is required) or the board meeting at which the matter is scheduled for disposition (if no public hearing is required).  In either situation, <u>the person or agency requesting the contested case hearing must file (or mail and postmark) a written petition with the board not later than ten days after the close of the public hearing or the board meeting, whichever is applicable</u>.  The time for making an oral or written request and submitting a written petition may be waived by the board.

(Emphasis added).

contested case hearing.

### ii. A Request for a Contested Case Hearing Was Not Required by Hawai'i Case Law

The PUC argues that "[t]his court's case law on contested case hearings clearly indicates that a request for a contested case hearing is a necessary prerequisite to judicial review of the kind LOL seeks." The PUC cites MECO, 141 Hawai'i at 255, 408 P.3d at 7, Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 380, 363 P.3d 224, 228 (2015), Kilakila, 131 Hawai'i at 195, 204, 317 P.3d at 29, 38, Kaleikini v. Thielen, 124 Hawai'i 1, 4, 237 P.3d 1067, 1070 (2010), and Pele Defense Fund, 77 Hawai'i at 66, 881 P.2d at 1212, for the proposition that "at the very least, a party must have requested a contested case hearing before it can object to the denial of such a hearing." To the contrary, this court's case law does not require a party to request a hearing to gain access to the courts, where the relevant agency has not promulgated a rule requiring such a request and the party has participated in a contested case proceeding.

A formal request for a contested case hearing is not a prerequisite for judicial review over an appeal under the cases cited by the PUC. In MECO, this court noted that, although the Sierra Club was not allowed to participate in the PUC's proceeding, it formally requested a contested case hearing. MECO, 141 Hawai'i at 255-57, 408 P.3d at 7-8. This court did

43

not, however, hold that a formal request for a contested case hearing is a prerequisite for judicial review. Furthermore, MECO is distinguishable from the instant case because unlike the Sierra Club in MECO, LOL actively participated in the 2017 Docket. Mauna Kea Anaina Hou, Kilakila, and Kaleikini are also distinguishable because each of those cases concerned appeals of BLNR decisions, and as explained supra, agency rules of the BLNR, unlike those of the PUC, require that a formal request for a contested case hearing be submitted to attain judicial review over an agency appeal.

Pele Defense Fund, which involved an appeal of a Department of Health (DOH) decision, is similarly distinguishable because DOH rules provide that in order to obtain judicial review, an interested person seeking a contested case hearing must submit a complaint or application requesting such a hearing.[18] 77 Hawai'i at 69, 881 P.2d at 1215 ("Appellees submitted 'Application[s] for Contested Case[s]' on forms provided by the DOH and in full compliance with the agency's rules."). Accordingly, the cases cited by the PUC do not establish that LOL was required to request a contested case hearing as a prerequisite to judicial review.

---

[18] DOH rules also allow the DOH to hold a contested case hearing on its own motion. See Pele Defense Fund, 77 Hawai'i at 69 n.12, 881 P.2d 1215 n.12.

## B.    Standing

In the context of administrative appeals brought pursuant to HRS § 91-14(a), this court has interpreted the concept of standing to be comprised of two components.[19] <u>Jordan v. Hamada</u>, 64 Haw. 451, 457-58, 643 P.2d 73, 75-76 (1982). "First, one must be a person aggrieved, inter alia, by a final decision and order in a contested case.  Second, the aggrieved person must have participated in the contested case from which the decision affecting him resulted."  <u>Id.</u> (citation and internal quotation marks omitted); <u>see also</u> <u>Mahuiki v. Planning Comm'n</u>, 65 Haw. 506, 515, 654 P.2d 874, 880 (1982).

### 1.    "Person Aggrieved"

To be a person aggrieved, "one must be specially, personally, and adversely affected" by the final decision and order at issue.  <u>Life of the Land, Inc. v. Land Use Comm'n</u>, 61 Haw. 3, 7, 594 P.2d 1079, 1082 (1979) (quoting <u>East Diamond Head Ass'n v. Zoning Board of Appeals</u>, 52 Haw. 518, 523 n.5, 479 P.2d 796, 799 n.5 (1971)).  An unfavorable final decision and order is not enough to satisfy this prong of the analysis - "[t]here must be a special injury or damage to one's personal or property rights[,] as distinguished from the role of being only a champion of causes."  <u>Id.</u>

---

[19]    HRS § 91-14(a) provides, in pertinent part, "[a]ny person aggrieved by a final decision and order in a contested case . . . is entitled to judicial review thereof under this chapter[.]"  Pursuant to HRS § 91-1, the term "persons" includes individuals, associations, and public or private organizations.

45

We have previously recognized the right to a clean and healthful environment, as defined by HRS Chapter 269, as a "legally protected interest" adequate to confer standing. MECO, 141 Hawaiʻi at 270-71, 408 P.3d at 22-23; see also Life of the Land v. Land Use Comm'n, 63 Haw. 166, 176-77, 177 n.10, 623 P.2d 431, 441, 441 n.10 (1981).

There is sufficient evidence in the record to demonstrate that the PUC's approval of the Amended PPA specially, personally, and adversely affected LOL's members. As set forth above, LOL is a Hawaiʻi-based nonprofit organization comprised of members who live, work, and recreate in Hawaiʻi. Such activity includes visiting and exploring the Big Island's Hāmākua Coast, where the Hu Honua facility is located. LOL asserts that the Hu Honua facility's use of biofuels for energy production may cause adverse environmental impacts on the Big Island. In addition to submitting several IRs regarding the GHG emissions associated with the Amended PPA, LOL submitted an IR to Hu Honua regarding the potential for ocean contamination caused by the improper disposal of wastewater at the facility. It also expressed concern regarding the environmental impacts associated with "acquiring bioenergy crops" from an area of the Big Island that already serves as a source for another biofuel facility, and whether the Hu Honua facility will "cut into the utilities['] purchase of energy from existing and/or planned wind and solar

farms."[20]  These impacts could affect the Big Island in general, and the Hāmākua Coast in particular.

Thus, LOL has demonstrated an injury to its members, including their right to a clean and healthful environment as defined by HRS Chapter 269, due to the PUC's approval of the Amended PPA.  LOL has therefore satisfied the first prong of the standing analysis.  See MECO, 141 Hawai'i at 270-71, 408 P.3d at 22-23; see also Sierra Club v. Hawai'i Tourism Authority ex rel. Bd. of Directors, 100 Hawai'i 242, 271, 59 P.3d 877, 906 (2002) ("An organization may sue on behalf of its members even though it

---

[20]    The PUC impliedly recognized this potential injury when it determined that, inter alia, "LOL's concerns regarding the proposed project's impact on existing renewable projects on the Big Island" were sufficient to satisfy the requirements of HAR § 6-61-56.

The grounds for participation without intervention in PUC proceedings, as set forth by HAR § 6-61-56(c) were:

>    (1)    . . . [T]he direct and substantial interest of the applicant;
>
>    (2)    The applicant's position regarding the matter in controversy;
>
>    (3)    The extent to which the participation will not broaden the issues or delay the proceeding;
>
>    (4)    The extent to which the applicant's interest will not be represented by existing parties;
>
>    (5)    A statement of the expertise, knowledge or experience the applicant possesses with regard to the matter in controversy;
>
>    (6)    Whether the applicant can aid the commission by submitting an affirmative case; and
>
>    (7)    . . . [T]he relief desired.

(Emphases added).  HAR § 16-601-56(c) sets forth identical grounds for participation without intervention.

has not been injured itself when:  (1) its members would otherwise have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief itself requested requires the participation of individual members in the lawsuit").

### 2.    Participation

Although an aggrieved person must have participated in a contested case in order to invoke judicial intervention, we have not "conditioned standing to appeal from an administrative decision upon formal intervention in the agency proceeding." Mahuiki, 65 Haw. at 515, 654 P.2d at 880 (quoting Jordan, 62 Haw. at 449, 616 P.2d at 1371).  Where "the appellants have been aggrieved by the action of the PUC, and where they were involved as participants during the [contested case,] the appellants may challenge the order of the PUC in this court."  Life of the Land, Inc. v. Land Use Comm'n, 61 Haw. at 9, 594 P.2d at 1083 (internal quotation marks and ellipsis omitted) (quoting In Re Application of Hawaiian Electric Co., 56 Haw. 260, 265, 535 P.2d 1102, 1106 (1975)).  Because LOL was involved in the 2017 Docket as a participant, it has met the second prong of the analysis.  LOL therefore has standing under HRS § 91-14(a) to appeal the PUC's 2017 D&O and the denial of its Motion to Upgrade Status.

### C.    Merits of LOL's Appeal

Pursuant to HRS § 269-6(b), the PUC must explicitly

48

consider the effect of the State's reliance on fossil fuels on, inter alia, GHG emissions.  We have characterized this as a "requirement to reduce reliance on fossil fuels and to consider [GHG] emissions[, which] applies to the fulfillment of all of the [PUC's] duties."  MECO, 141 Hawai'i at 263, 408 P.3d at 15.  That the facility involved in the Amended PPA is a biofuel facility does not absolve the PUC of this duty.  Thus, in approving the Amended PPA, the PUC was required to expressly consider the reduction of GHG emissions.  Id. at 264, 408 P.3d at 16. Further, LOL was entitled to a meaningful opportunity to be heard on the issue of the Amended PPA's impact on its constitutional right to a clean and healthful environment, as defined by HRS Chapter 269.

The findings and conclusions in the PUC's 2017 D&O do not show that the PUC expressly considered the reduction of GHG emissions in reaching its decision.  The PUC also denied LOL due process by preventing LOL from addressing the impacts of approving the Amended PPA on LOL's right to a clean and healthful environment, as defined by HRS Chapter 269.

1. **The PUC Failed to Satisfy its Statutory Obligations Under HRS § 269-6(b)**

HRS § 269-6(b) provides:

> The public utilities commission shall consider the need to reduce the State's reliance on fossil fuels through energy efficiency and increased renewable energy generation in exercising its authority and duties under this chapter. In making determinations of the reasonableness of the costs of utility system

> capital improvements and operations, the commission
> shall explicitly consider, quantitatively or
> qualitatively, the effect of the State's reliance on
> fossil fuels on price volatility, export of funds for
> fuel imports, fuel supply reliability risk, and [GHG]
> emissions.  The commission may determine that
> short-term costs or direct costs that are higher than
> alternatives relying more heavily on fossil fuels are
> reasonable, considering the impacts resulting from the
> use of fossil fuels.

(Emphases added).

In MECO, this court observed that "[i]n 2011, the legislature amended HRS § 269-6(b) to make it mandatory for the Commission when exercising its duties to recognize the 'need' to reduce reliance on fossil fuels and to 'explicitly consider' the levels and effect of [GHG] emissions[.]"  141 Hawaiʻi at 262, 408 P.3d at 14 (emphasis in original).  This court determined that "a primary purpose of the [2011 amendment] was to require the Commission to consider the hidden and long-term costs of reliance on fossil fuels, which subjects the State and its residents to increased air pollution and potentially harmful climate change due to the release of harmful [GHGs]."[21]  Id. at 263, 408 P.3d at

---

[21]    Relatedly, we note that the State has committed to furthering the goals of the Paris Climate Agreement.  2018 Haw. Sess. Laws. Act 15, § 1 at 46-47 ("The legislature notes that Hawaiʻi, as part of the United States Climate Alliance . . . committed to upholding the objectives of the 2015 Paris Agreement.").  This commitment is advanced through HRS Chapter 225P, which provides, in part:

> The purpose of [the] chapter is to address the effects
> of climate change to protect the State's economy,
> environment, health, and way of life.  [The] chapter
> establishes the framework for the State to:
>
> 1)    Adapt to the inevitable impacts of global
>       warming and climate change, including rising sea
>                                         (continued...)

50

15 (quoting H. Stand. Comm. Rep. No. 1004, in 2011 House Journal, at 1332) (internal quotation marks omitted).  This court then concluded that "HRS § 269-6(b)'s requirement to reduce reliance on fossil fuels and to consider [GHG] emissions applies to the fulfillment of <u>all</u> of the Commission's duties."  <u>Id.</u> (emphasis added).  Accordingly, pursuant to <u>MECO</u>, HRS § 269-6(b) requires that "express consideration be given to reduction of [GHG] emissions in the decision-making of the Commission."  <u>Id.</u> at 264, 408 P.3d at 16.  Thus, it is clear that the PUC was required to expressly consider the reduction of GHG emissions in deciding whether to approve the Amended PPA.

In determining whether the PUC satisfied this duty pursuant to HRS § 269-6(b), this court "should ensure that the agency . . . [made] its findings reasonably clear.  The parties and the court should not be left to guess . . . the precise finding of the agency."  <u>Kauai Springs, Inc. v. Planning Comm'n of Cty. of Kauai</u>, 133 Hawai'i 141, 164, 324 P.3d 951, 974 (2014) (citation and quotation marks omitted).  "An agency's findings should be sufficient to allow the reviewing court to track the

_____

[21](...continued)
          levels, temperatures, and other risk factors; and

    2)    Mitigate its greenhouse gas emissions by sequestering more atmospheric carbon and greenhouse gases than the State produces as quickly as practicable, but no later than 2045.

HRS § 225P-1 (Supp. 2018).

steps by which the agency reached its decision." Id. (citation and quotation marks omitted); see also In re Wai'ola O Moloka'i, Inc., 103 Hawai'i 401, 432, 83 P.3d 664, 695 (2004) (explaining that any presumption of validity, given to an agency's decision, "presupposes that the agency has grounded its decision in reasonably clear" findings of fact and conclusions of law).

Because the 2017 D&O does not reflect that the PUC explicitly considered the reduction of GHG emissions in approving the Amended PPA, we conclude that the PUC failed to comply with HRS § 269-6(b). The only reference to GHG emissions in the 2017 D&O appears in the "Procedural Background" section. It reads, "[c]omments in opposition to the Project tended to focus on potential adverse environmental impacts, an expected rise in [GHG] emissions, . . . and general objections to biomass as a fuel resource." The 2017 D&O does not provide responses to those comments, nor is there any mention of GHG emissions in the PUC's "Statement of Issues" or "Discussion and Findings." Further, although the PUC restated HELCO's representations that the biomass facility could potentially save approximately 15,700 barrels of fuel per year and contribute to the State's RPS goals, it made no express findings or conclusions regarding the biomass facility's GHG emissions.

In its findings and conclusions, the PUC found that Hu Honua's biomass facility may displace fossil fuel generation resources and accelerate the retirement of fossil fuel plants,

52

and noted that its decision to approve the Amended PPA was based on "factors such as the State's need to limit its dependence on fossil fuels and mitigate against volatility in oil pricing." These findings and conclusions do not constitute "express consideration" of the reduction of GHG emissions, as provided for under HRS § 269-6(b). See MECO, 141 Hawaiʻi at 264, 408 P.3d at 16.

In MECO, Maui Electric requested that the PUC determine whether its proposed PPA was prudent and in the public interest, and consider the reasonableness of the associated energy charges. Id. at 265-66, 408 P.3d at 17-18. This court explained that when reviewing the PPA, the PUC was required under HRS § 269-6(b) to consider the hidden and long-term costs of energy produced under the Agreement, including the potential for increased air pollution due to GHG emissions. Id. at 266, 408 P.3d at 18. This court further stated that the consideration of potential health risks is "axiomatic" in the PUC's analysis of the level of GHG emissions, "as contemplated by the legislature when it amended HRS § 269-6(b) in 2011[.]" Id.

Similarly, in the instant case, HELCO requested that the PUC determine whether the energy charges under the Amended PPA were reasonable and if its arrangement with Hu Honua was prudent and in the public interest. In its review of the Amended PPA, the PUC found that the "purchased power costs and arrangements set forth in the [Amended] PPA appear reasonable,

53

prudent, in the public interest, and consistent with HRS chapter 269 in general, and HRS § 269-27.2(c), in particular." The PUC did not, however, substantiate this finding by addressing the hidden and long-term environmental and public health costs of reliance on energy produced at the proposed facility, as required. These costs include "the potential for increased air pollution as a result of GHG emissions" directly attributed to energy generation at the facility, as well as GHG emissions produced at earlier stages in the production process, such as fuel production and transportation. See MECO, 141 Hawai'i at 263, 408 P.3d at 15 ("a primary purpose of [amending HRS § 269-6(b)] was to require the [PUC] to consider the hidden and long-term costs of reliance on fossil fuels, which subjects the State and its residents to increased air pollution and potentially harmful climate change due to the release of harmful [GHGs].") (internal quotation marks and citation omitted).

Accordingly, the 2017 D&O was not supported by findings regarding GHG emissions of the Hu Honua facility "sufficient to allow the reviewing court to track the steps by which the [PUC] reached its decision." Kauai Springs, Inc., 133 Hawai'i at 164, 324 P.3d at 974. Without such explicit findings, this court cannot determine whether the PUC adequately considered GHG emissions as required by HRS § 269-6(b).

"A remand pursuant to HRS § 91-14(g) is appropriate if an agency's findings are incomplete and provide no basis for

review." Int'l Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co., 68 Haw. 316, 328, 713 P.2d 943, 953 (1986) (citing In re Kauai Elec. Div. of Citizens Util. Co., 60 Haw. 166, 185–86, 590 P.2d 524, 538 (1978)). HRS § 91–14(g) provides as follows:

> Upon review of the record, the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> (1) In violation of constitutional or statutory provisions;
>
> . . . .
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Where the PUC's failure to make sufficient findings leaves this court unable to determine the validity of its conclusions, it is appropriate to remand the case to the PUC for further proceedings, pursuant to HRS § 91-14(g), in order for the PUC to make findings necessary for judicial review. Application of Hawaiian Tel. Co., 54 Haw. 663, 669, 513 P.2d 1376, 1379 (1973); see also In re Kauai Elec. Div. of Citizens Util. Co. 60 Haw. at 185, 590 P.2d at 537 (remanding the case to the PUC for further proceedings, pursuant to HRS § 91-14(g), because the PUC's order was "unsupported by findings of fact and conclusions").

Here, remand to the PUC for further proceedings is appropriate. On remand, the PUC shall give explicit

55

consideration to the reduction of GHG emissions in determining whether to approve the Amended PPA, and make the findings necessary for this court to determine whether the PUC satisfied its obligations under HRS § 269-6(b).

   2.   **The PUC's Failure to Provide LOL an Opportunity to Be Meaningfully Heard in the 2017 Docket Denied LOL Due Process**

"The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant property interest." Sandy Beach Def. Fund, 70 Haw. at 378, 773 P.2d at 261 (citing Matthews v. Eldridge, 424 U.S. 319, 333 (1976)). As discussed supra, this court has recognized that the "right to a clean and healthful environment, as defined by laws relating to environmental quality," is a property interest protected by due process because it is a substantive right guaranteed by article XI, section 9 of the Hawai'i Constitution. MECO, 141 Hawai'i at 253, 260-61, 408 P.3d at 5, 12-13. In MECO, after concluding that Sierra Club's asserted property interest required a hearing by the PUC to comply with due process, this court observed that procedural due process includes "the right to submit evidence and argument on . . . the impact of the Agreement on the asserted property interest." Id. at 269, 408 P.3d at 21 (citation omitted). This court then stated that the PUC "has the authority to set limitations in conducting the proceedings so long as the

56

procedures sufficiently afford an opportunity to be heard at a meaningful time and in a meaningful manner on the issue of the Agreement's impact on the asserted property interest." Id. at 270, 408 P.3d at 22.

As explained above, procedural due process necessitated a contested case hearing because the 2017 D&O, which approved the Amended PPA, adversely affected LOL's constitutionally protected right to a clean and healthful environment, as defined by HRS Chapter 269. See id. at 265, 408 P.3d at 17 (agency hearing required "when the challenged State action adversely affects the constitutionally protected rights of others") (quoting Pele Def. Fund, 77 Hawaiʻi at 68, 881 P.2d at 1214) (internal quotation marks omitted). Accordingly, LOL was entitled to an opportunity to be heard at a meaningful time and in a meaningful manner regarding the Amended PPA's impact on its right to a clean and healthful environment, as defined by HRS Chapter 269. See id. at 270, 408 P.3d at 22.

LOL was not afforded a sufficient opportunity to address the Amended PPA's impact on its constitutional right to a clean and healthful environment, as defined by HRS Chapter 269, throughout the 2017 Docket. The PUC allowed LOL to participate in the 2017 Docket with respect to two sub-issues: (2.a.i) whether the energy price components in the Amended PPA properly reflect the cost of biomass fuel supply, and (2.b) whether HELCO's purchase power arrangements under the Amended PPA are

57

prudent and in the public interest. LOL argued that the proposed biomass facility was not in the public interest and should be rejected. LOL further argued that "the issue of climate change is embedded in both issues the Commission assigned to LOL to consider[,]" that Hu Honua's proposal failed to fully address the environmental impact of its operations, and that Hu Honua's claims of carbon-neutrality were unsupported.

However, HELCO refused to respond to LOL's IRs regarding environmental impacts of the project and production of an environmental site assessment because those topics were outside the scope of LOL's participation. Hu Honua similarly objected to LOL's IRs regarding loss of stored carbon from tree harvesting, environmental impacts of the project, and production of an environmental site assessment as outside the scope of LOL's restricted participation. LOL filed a Motion to Compel, seeking lease agreements and a forestry operations report from Hu Honua, in order to address the cost of biomass fuel supply and GHG emissions from the facility's operations. However, the PUC denied LOL's motion, finding that "LOL's Motion to Compel, if granted, would cause an undue delay in this proceeding."

Thus, although the 2017 D&O acknowledged LOL's attempts to discuss the Amended PPA's impacts on LOL's right to a clean and healthful environment, as defined by HRS Chapter 269, in addressing whether the Amended PPA is prudent and in the public interest, the PUC did not afford LOL an opportunity to be heard

regarding this issue at a meaningful time and in a meaningful manner. Rather, the PUC prevented LOL from meaningfully addressing the impact that approving the Amended PPA would have on LOL's asserted property interest, based on its determination that LOL's environmental concerns were beyond the scope of the 2017 Docket. Accordingly, the PUC's procedures violated LOL's due process right to be meaningfully heard regarding the impacts that approving the Amended PPA would have on LOL's right to a clean and healthful environment, as defined by HRS Chapter 269.

Due to the PUC's failure to allow LOL to present evidence and argument concerning its right to a clean and healthful environment, as defined by HRS Chapter 269, this court must vacate the PUC's 2017 D&O and remand this case to the PUC for a hearing that complies with procedural due process. In order to comply with statutory and constitutional requirements, the PUC's post-remand hearing must afford LOL an opportunity to meaningfully address the impacts of approving the Amended PPA on LOL's members' right to a clean and healthful environment, as defined by HRS Chapter 269. The hearing must also include express consideration of GHG emissions that would result from approving the Amended PPA, whether the cost of energy under the Amended PPA is reasonable in light of the potential for GHG emissions, and whether the terms of the Amended PPA are prudent and in the public interest, in light of its potential hidden and long-term consequences. See MECO, 141 Hawai'i at 269, 408 P.3d

at 21.

3.   **The PUC's Denial of LOL's Motion to Upgrade Status**

LOL asserts that the PUC's denial of its Motion to Upgrade Status in Order No. 34651 was clearly erroneous and constituted an abuse of discretion.  LOL further argues that its "participant" status and the restriction of its participation to two issues in the 2017 Docket denied it a sufficient opportunity to protect its constitutional right to a clean and healthful environment, as defined by HRS Chapter 269.

Hu Honua, HELCO, and the PUC argue that it was within the PUC's discretion to find that LOL's motion failed to satisfy the factors under HAR § 6-61-55 for party-intervenor status.  HELCO additionally argues that LOL is time-barred from challenging the PUC's denial because it did not do so within the thirty-day time period required by HRS § 91-14(b).  We conclude that LOL's appeal of Order No. 34651 is timely, but we need not determine whether the PUC abused its discretion or violated LOL's due process right in denying LOL's Motion to Upgrade Status.

a.   **Timeliness of LOL's Appeal of Order No. 34651 Denying LOL's Motion to Upgrade Status**

LOL's appeal of Order No. 34651 is timely.  Under HRS § 91-14(b), appeals are timely where the appellant files its notice of appeal "within thirty days after service of the certified copy of the final decision and order of the agency[.]" HELCO cites Kilakila, 131 Hawai'i at 195, 317 P.3d at 29, for the

proposition that "denied requests to intervene are final orders as defined in HRS § 91-14," and argues that Order No. 34651, which denied LOL's Motion to Upgrade Status to party-intervenor, was a "final decision and order" subject to the thirty-day time limit under HRS § 91-14(b). Because Order No. 34651 was issued on June 23, 2017 and LOL appealed that determination sixty-four days later on August 26, 2017, HELCO contends that LOL's appeal is untimely.

In Kilakila, this court considered whether the BLNR's decision to approve a permit, without either granting or denying Kilakila's request for a contested case hearing, was a "final decision and order" within the meaning of HRS § 91-14. 131 Hawaiʻi at 202-03, 317 P.3d at 36-37. We noted that in Kaleikini, 124 Hawaiʻi at 26, 237 P.3d at 1092, the "DLNR's decision to deny Kaleikini's request for a contested case hearing constituted a final decision and order of the agency because it ended the litigation." Id. at 203, 317 P.3d at 37 (internal quotations omitted). We then determined that the BLNR's vote to grant the permit effectively denied Kilakila's request for a contested case hearing, and was therefore a "final decision and order," as it provided the requisite finality to enable Kilakila to appeal. Id.

Here, Order No. 34651 Denying LOL's Motion to Upgrade Status was not required to be appealed within thirty days because it did not constitute a "final decision and order" of the PUC.

The order denied LOL party status and confirmed LOL's limited participant status, but did not resolve all other outstanding issues in the 2017 Docket.  Thus, unlike the agency decisions in Kaleikini and Kilakila, which provided appellants the "requisite finality" by "end[ing] the litigation[,]" the PUC's Order No. 34651 merely maintained LOL's participation in the proceeding. See Kilakila, 131 Hawaiʻi at 203, 317 P.3d at 37.  Therefore, LOL's appeal would have been unripe until the PUC issued the 2017 D&O, which represents the "final decision and order" of the PUC. The PUC issued the 2017 D&O on July 28, 2017, which, along with Order No. 34651 Denying LOL's Motion to Upgrade Status, was appealed by LOL on August 26, 2017.  As LOL filed its notice of appeal twenty-nine days after the PUC's 2017 D&O, its appeal is timely.

   **b.    We Need Not Decide Whether the PUC Abused its Discretion or Violated Due Process by Denying LOL's Motion to Upgrade Status**

HAR § 6-61-55 set forth nine factors for the PUC to consider in determining whether to grant a motion to intervene as a party in a PUC proceeding.  The rule further provided that the PUC would not grant intervention "except on allegations which are reasonably pertinent to and do not unreasonably broaden the issues already presented."[22]  Pursuant to HAR § 6-61-55(a),

---

[22]    HAR § 6-61-55 provided:

   (a)   A person may make an application to intervene
         and become a party by filing a timely written
                                        (continued...)

(...continued)

> motion in accordance with sections 6-61-15 to
> 6-61-24, section 6-61-41, and section 6-61-57,
> stating the facts and reasons for the proposed
> intervention and the position and interest of
> the applicant.
>
> (b)  The motion shall make reference to:
>
>> (1)  The nature of the applicant's statutory or
>> other right to participate in the hearing;
>>
>> (2)  The nature and extent of the applicant's
>> property, financial, and other interest in
>> the pending matter;
>>
>> (3)  The effect of the pending order as to the
>> applicant's interest;
>>
>> (4)  The other means available whereby the
>> applicant's interest may be protected;
>>
>> (5)  The extent to which the applicant's
>> interest will not be represented by
>> existing parties;
>>
>> (6)  The extent to which the applicant's
>> participation can assist in the
>> development of a sound record;
>>
>> (7)  The extent to which the applicant's
>> participation will broaden the issues or
>> delay the proceeding;
>>
>> (8)  The extent to which the applicant's
>> interest in the proceeding differs from
>> that of the general public; and
>>
>> (9)  Whether the applicant's position is in
>> support of or in opposition to the relief
>> sought.
>
> (c)  The motion shall be filed and served by the
> applicant in accordance with sections 6-61-21
> and 6-61-57.
>
> (d)  Intervention shall not be granted except on
> allegations which are reasonably pertinent to
> and do not unreasonably broaden the issues
> already presented.

Other than the HAR section numbers it references, HAR 16-601-55

(continued...)

"[i]ntervention as a party in a proceeding before the PUC is not a matter of right[,] but is a matter resting within the sound discretion of the commission[,]" as long as that discretion is not exercised arbitrarily or capriciously.  <u>Application of Hawaiian Elec. Co., Inc.</u>, 56 Haw. 260, 262, 535 P.2d 1102, 1104 (1975) (citation omitted).

LOL argues that the limitation of its participation to Sub-issue Nos. 2.a.i and 2.b denied it a meaningful opportunity to address its constitutional right to a clean and healthful environment.  However, as discussed above, the record does not establish that the PUC explicitly considered the reduction of GHG emissions <u>at all</u> in the 2017 Docket.  It is therefore clear that the PUC misconstrued this aspect of its statutory duty, which was fundamental to LOL's potential role in the proceeding.  As such, it appears the PUC's denial of LOL's Motion to Upgrade Status was premised on a flawed understanding of the relevant inquiry, and therefore we cannot say whether such denial constituted an abuse of discretion.

LOL further argues that the PUC's denial of its Motion to Upgrade Status violated its due process rights by impeding its ability to obtain access to documents.  However, the record does not establish that the PUC restricted LOL's access to documents

---

(...continued)
(effective Jan. 1, 2019) is identical to HAR 6-61-55 (effective 1992-2018).

due to its status as a limited participant. Order No. 34597, which established, inter alia, a final statement of the issues and LOL's scope of participation in the 2017 Docket, limited LOL's participation to Sub-issue Nos. 2.a.i and 2.b, but did not restrict the manner of its participation within those issues. Further, Protective Order No. 34555, which "govern[ed] the classification, acquisition, and use of trade secrets, and other confidential information" produced in the docket, provided that "[a]ll parties or participants to all or any portion of this docket . . . shall be entitled to all confidential information under the provisions of this Protective Order to the extent allowed by the commission." (Emphasis added). LOL does not allege or demonstrate that access to documents designated as "confidential" was given to parties, but denied to participants. Accordingly, it is not apparent from the record that LOL would have had greater access to documents had the PUC granted its Motion to Upgrade Status.

In sum, on remand, it is within the PUC's discretion to determine the extent of LOL's participation in the proceeding, pursuant to HAR § 16-601-55, provided that the PUC complies with its statutory and constitutional obligations to consider the reduction of GHG emissions and to allow LOL a meaningful opportunity to be heard regarding the Amended PPA's impact on its right to a clean and healthful environment, as defined by HRS Chapter 269.

65

## IV.   CONCLUSION

As set forth above, HRS § 269-6(b) requires the PUC to expressly consider the reduction of GHG emissions in its decision-making.  The PUC failed to do so in determining whether the costs associated with the Amended PPA were reasonable, and in approving the Amended PPA.  The PUC also failed to afford LOL an opportunity to be heard at a meaningful time and in a meaningful manner regarding the Amended PPA's impact on LOL's property interest in a clean and healthful environment, as defined by HRS Chapter 269.

The PUC's 2017 D&O is therefore vacated and this case is remanded to the PUC for proceedings consistent with this opinion.

| | |
|---|---|
| Lance D. Collins<br>for appellant | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Clyde J. Wadsworth<br>(Kalikoʻonalani D.<br>Fernandes with him<br>on the brief)<br>for appellee PUC | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

Lance D. Collins
for appellant

Clyde J. Wadsworth
(Kalikoʻonalani D.
Fernandes with him
on the brief)
for appellee PUC

Margery S. Bronster
(Rex Y. Fujichaku and
Kelly A. Higa with
her on the brief)
for appellee
Hu Honua Bioenergy, LLC

Joseph A. Stewart
(David M. Louie and
Aaron R. Mun with
him on the brief)
for appellees
HECO and HELCO

