*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCOT-22-0000418
13-MAR-2023
08:51 AM
Dkt. 343 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

In the Matter of the Application of

HAWAI'I ELECTRIC LIGHT COMPANY, INC.

For Approval of a Power Purchase Agreement for Renewable
Dispatchable Firm Energy and Capacity.

SCOT-22-0000418

APPEAL FROM THE PUBLIC UTILITIES COMMISSION
(Docket No. 2017-0122)

MARCH 13, 2023

RECKTENWALD, C.J., NAKAYAMA, McKENNA, WILSON, AND EDDINS, JJ.;
WITH WILSON, J., ALSO CONCURRING SEPARATELY

OPINION OF THE COURT BY EDDINS, J.

Over ten years ago, energy company Hu Honua had a

brainwave: it could produce renewable energy by burning trees.

The company sought regulatory approval to supply energy to

Hawai'i Island using a biomass power plant. Last summer,

approval for that energy deal was denied. Hu Honua appeals the

denial, arguing that the Public Utilities Commission (PUC) misunderstood its mandate and held Hu Honua to an unfair standard.

We disagree. The PUC understood its public interest-minded mission. It faithfully followed our remand instructions to consider the reasonableness of the proposed project's costs in light of its greenhouse gas emissions and the project's impact on intervenor Life of the Land's members' right to a clean and healthful environment. It stayed true to the language of its governing statute HRS § 269-6(b) (Supp. 2021) by measuring the project's cost and system impact. And it acted properly within its role as fact-finder when it evaluated Hu Honua by its own statements and promises and, ultimately, found them unconvincing.

Finding no error, we affirm the PUC's decision rejecting the power purchase agreement between Hu Honua and the Hawai'i Electric Light Company, Inc.

**I.**

In 2012, Hawai'i Electric Light Company, Inc. (HELCO) approached its regulator, the Public Utilities Commission, about entering into a power purchase agreement (PPA) with private company Hu Honua Bioenergy, LLC (Hu Honua). Under the agreement, Hu Honua would convert an abandoned power plant in Pepe'ekeo, Hawai'i. The plant would produce energy by burning

2

woody biomass — mainly locally-grown eucalyptus trees. HELCO would purchase this energy to service Hawai'i Island's power grid.

In 2017, the PUC granted HELCO a waiver from the competitive bidding process and held a contested case hearing over the PPA. Life of the Land (LOL), a Hawai'i-based community action group dedicated to protecting and preserving the 'āina, sought to intervene in the hearing. They were given limited, rather than full participant, status. The PUC ultimately approved an Amended PPA between Hu Honua and HELCO for a thirty-year term. LOL appealed the decision.

In Matter of Hawai'i Elec. Light Co., Inc., 145 Hawai'i 1, 445 P.3d 673 (2019) (HELCO I), this court vacated the PUC's decision. We told the commission to hold a new hearing. Our remand instructed the PUC to give "LOL an opportunity to meaningfully address the impacts of approving the Amended PPA on LOL's members' right to a clean and healthful environment, as defined by HRS Chapter 269." Id. at 26, 445 P.3d at 698. We also told the PUC to give "express consideration of GHG emissions that would result from approving the Amended PPA, whether the cost of energy under the Amended PPA is reasonable in light of the potential for GHG emissions, and whether the terms of the Amended PPA are prudent and in the public interest,

3

in light of its potential hidden and long-term consequences." Id.

On remand, the PUC devoted its attention to a threshold issue - whether it should "reissue" to HELCO a waiver from the competitive bidding process. Matter of Hawai'i Elec. Light Co., Inc., 149 Hawai'i 239, 240, 487 P.3d 708, 709 (2021) (HELCO II). It decided to deny the waiver. Id. Since HELCO now had no waiver, the PUC declined to consider the merits of the Amended PPA. Id.

This time, Hu Honua appealed. Because the competitive waiver issue was outside the scope of HELCO I's remand, we returned the case. We repeated our remand order from HELCO I. Id. at 242, 487 P.3d at 711.

The PUC held a new contested case hearing on the Amended PPA in early March 2022. Before the evidentiary hearings began, Hu Honua brought several motions centered on Act 82, which had amended HRS § 269-6(b) in 2021. HRS § 269-6(b) is the primary statute governing the PUC's evaluation of energy projects like the Amended PPA. It requires the PUC to engage in "public interest-minded balancing." Matter of Maui Elec. Co., Ltd., 150 Hawai'i 528, 532, 506 P.3d 192, 196 (2022) (Paeahu).

Hu Honua argued that Act 82 changed things. It said the PUC could now only consider GHG emissions from *fossil fuels*.

Emissions from other sources, such as biomass burned to produce renewable energy, had to be kept out of the equation.

The commission rejected this approach. It concluded that Act 82 did not materially alter its statutory obligations under HRS § 269-6(b).

At the hearings, Hu Honua and HELCO maintained that the Amended PPA served the public interest. Yet they admitted that by their own numbers, the proposed project would produce massive carbon emissions - 8,035,804 metric tons over its 30-year term. The vast majority of these emissions would come from the plant's routine operations. Trucking trees to the plant would emit carbon. And when the trees burned, "stack emissions" would rise into the atmosphere.

But Hu Honua made a promise: the project would ultimately be carbon neutral. Hu Honua intended to offset its emissions by planting trees. These trees would sequester, by Hu Honua's count, 8,066,309 metric tons of carbon. That would zero out the project's projected eight million metric ton carbon price tag. If everything went right, it would even make the project carbon negative.

Hu Honua hoped to source all of its "feedstock," that is, the organic matter it hoped to burn for fuel, from locally-grown eucalyptus. Its tree supplier, a sister company to Hu Honua, would initially source eucalyptus from Pāhala, Pāʻauhau, and

Hāmākua plantations on Hawai'i Island. According to Hu Honua, those lands have enough trees to fuel the project for nine years. Hu Honua suggested it could help the State by eradicating "invasive species" on Hawai'i Island and burning them as an additional fuel source. Hu Honua also claimed that sourcing feedstock outside of the island would only occur in an emergency.

To meet its sequestration goals, Hu Honua would have to plant a *lot* of trees. The company maintained that the bulk of this tree-planting — expected to sequester 5,882,322 metric tons of carbon — would occur on leased Hawai'i Island land. In Hu Honua's sequestration analysis, it included the three plantations it expected to source feedstock from. The sequestration analysis assumed that no trees would be cut down at these plantations between 2017 and 2021. But in testimony, Hu Honua indicated that harvesting had taken place at the Pāhala location during this period. The company did not demonstrate that it was currently replanting trees on this plantation. In fact, it stated that it does not plan to regrow the Pāhala and Hāmākua plantations at all.

Hu Honua provided the PUC with a "carbon calculator" that indicated its estimated emissions and sequestration numbers. The calculator showed significant increases in sequestration between 2021 and 2029. This implied an expansion in Hu Honua's

current leasing regime. All those extra trees would have to be planted *somewhere*.

But Hu Honua did not present evidence that it had leases secured that extended through the PPA's 30-year term. Rather, Hu Honua indicated that it had non-binding "good faith" lease negotiations that would not be finalized until the PUC approved the Amended PPA.

Hu Honua promised that if its sequestration performance fell short of its estimates, it would buy carbon offsets to make up for the deficit. It pledged up to $450,000 for this effort, believing that it could buy carbon offsets at the price of $15 per ton. Hu Honua did not identify the sources of the offsets, only saying that "reputable sources" would sell them. And Hu Honua did not explain how the PUC would verify the sequestration produced through these sales.

To supplement Hu Honua's carbon calculator, HELCO submitted its own analysis. This analysis measured GHG emissions from Hu Honua's project against a baseline without the project. HELCO estimated that Hu Honua's project would prevent 1,464,742 metric tons of emissions from entering the atmosphere. HELCO's consultant reached this number by combining an estimate of GHG emissions that would be avoided because of the project relative to the baseline, and the project's estimated lifetime emissions. HELCO's analysis took the carbon negative lifetime emissions

estimate from Hu Honua's analysis and plugged it into its own. Though HELCO labeled its analysis independent, it in fact relied on Hu Honua's.

On May 23, 2022, the PUC issued Decision and Order No. 38395. It declined to approve the Amended PPA.

In the order, the PUC found that the project would produce massive GHG emissions, and that Hu Honua's promise of carbon neutrality rested on speculative, uncertain assumptions. The commission expressed serious doubts that Hu Honua could actually live up to its sequestration estimates. It pointed out that Hu Honua had no firm plans for leasing land to plant trees. Using the carbon calculator provided by Hu Honua, the commission found that even changes as small as one-percent in Hu Honua's emissions and sequestration estimates would make the project a net carbon emitter. The commission calculated that the back-up money Hu Honua pledged, even if carbon offsets were available at the rate it expected, would only buy 30,000 metric tons of carbon offsets — less than one sixth of the carbon the project (per Hu Honua's own estimates) would emit annually.

The PUC was particularly troubled by the frontloading of GHG emissions in the project. While Hu Honua pledged to be carbon neutral on an annual basis by the end of 2035, the commission determined (again based on Hu Honua's numbers) that the *overall* impact of the project would not be carbon neutral

8

until 2047, two years after Hawai'i's 2045 zero emissions target came and went. For the first 25 years of the project, Hu Honua would be a significant net emitter. If Hu Honua did not meet its sequestration commitments, the PUC feared that the damage to the atmosphere could not be easily undone.

The PUC also found that the Amended PPA would significantly increase costs for rate-payers. Six years into the project, the fuel price was set to spike 15%, for no discernable reason. That spike - in combination with other pricing terms and adjustments for inflation - meant that the cost would continually rise. Overall, the PUC found that the project would increase the typical consumer bill by an average of $10.97 a month throughout the full 30-year term. The PUC deemed this a significant bill impact. HELCO stated that there were no realistic modeling assumptions under which the project "could produce a net savings to the system or customer." Based on the project's high GHG emissions, the PUC did not consider these higher costs to consumers reasonable.

The PUC had another big time concern. The commission found that not only would the project fail to accelerate the retirement of fossil-fuel, it would *displace* other, more environmentally friendly renewable resources. Hu Honua said that its plant would only displace the fossil fuel-based Keāhole power plant. However, HELCO, which actually controls energy

dispatch, testified that this claim was "unrealistic" and "contrary to [HELCO's] practices" and "actual operational conditions." HELCO said that it would be "impossible" for the project to avoid displacing other renewable resources. The Consumer Advocate, a statutorily-mandated party to the proceedings, estimated that almost 60% of Hu Honua's generation would replace renewable energy generation. Here, the commission credited the testimony of HELCO and the Consumer Advocate over Hu Honua's. The PUC also credited HELCO's testimony that the Hu Honua project filled no pressing need in its power grid.

Summing up, the PUC found that the proposed project would emit substantially more carbon than it sequestered for at least the first 25 years of operation and raise ratepayer prices for the full term. And the PUC found Hu Honua's promise of eventual carbon neutrality speculative at best. Based on these findings, the PUC concluded that the Amended PPA was not in the public interest. It rejected the agreement.

Hu Honua moved the PUC to reconsider its Decision and Order. The PUC denied the motion in Decision and Order No. 38443.

Hu Honua appealed. It argues that (1) the PUC's order exceeded the scope of the HELCO I remand by considering energy prices, (2) the PUC improperly applied HRS § 269-6(b) by not limiting its comparison of the project to only fossil fuel

alternatives, and (3) violated Hu Honua's due process rights by finding facts not in the record, applying a wrong evidentiary standard, and subjecting Hu Honua to a carbon neutrality requirement.

## II.

## A.

We begin with the scope of remand. Hu Honua characterizes the HELCO I remand as confining the PUC to the "one discrete issue" of GHG emissions. Considerations of other key issues were "off-limits."

Where, exactly, Hu Honua locates this limitation remains a mystery. In HELCO I, we vacated the PUC's order and remanded for a new hearing. The PUC had to give "LOL an opportunity to meaningfully address the impacts of approving the Amended PPA on LOL's members' right to a clean and healthful environment, as defined by HRS Chapter 269." HELCO I, 145 Hawaiʻi at 26, 445 P.3d at 698. We said the hearing *must* include "express consideration of GHG emissions that would result from approving the Amended PPA, whether the cost of energy under the Amended PPA is reasonable in light of the potential for GHG emissions, and whether the terms of the Amended PPA are prudent and in the public interest, in light of its potential hidden and long-term consequences." Id.

11

Then, in HELCO II, this court explicitly considered the scope of the HELCO I remand.  We reminded the parties that they were "fixed in the same position they were in following HELCO I" and repeated our remand instructions verbatim.  HELCO II, 149 Hawai'i at 242, 487 P.3d at 711.

Hu Honua seems to feel that the PUC's consideration of pricing is unfair because back in its 2017 Decision & Order the PUC found the pricing reasonable.  But that 2017 Decision & Order was precisely what HELCO I *vacated*.  HELCO I, 145 Hawai'i at 28, 445 P.3d at 700.  Based on the straightforward language of the remand order, the PUC was not only *at liberty* to consider pricing, it was *required* to consider the reasonability of the project's pricing in light of its GHG emissions.  Hu Honua's insistence that no specific language directs further consideration of energy costs is difficult to understand.  Our roadmap was a simple one, and we gave it twice.

Even setting the remand language aside, the PUC has a duty to act in the public interest.  See Haw. Const. art. XI, § 1; HRS § 269-145.5(b) (2020) ("In advancing the public interest, the commission shall balance technical, economic, environmental, and cultural considerations . . ."); Paeahu, 150 Hawai'i at 534, 506 P.3d at 198 (principle that PUC must act in the public interest is "incorporated throughout HRS chapter 269").

12

Protecting rate-payers by considering pricing impacts follows from that public interest obligation.

**B.**

Hu Honua's interpretation of HRS § 269-6(b) is equally strained. "HRS Chapter 269 is a law relating to environmental quality that defines the right to a clean and healthful environment under article XI, section 9 by providing that express consideration be given to reduction of greenhouse gas emissions in the decision-making of the Commission." In re Application of Maui Elec. Co., Ltd., 141 Hawai'i 249, 264, 408 P.3d 1, 16 (2017) (MECO).

HRS § 269-6(b) sets out specific factors the PUC must consider to determine whether the costs of a proposed energy project are reasonable. These include (1) price volatility; (2) export of funds for fuel imports; (3) fuel supply reliability risk; and (4) greenhouse gas emissions. The PUC then subjects these factors to "public interest-minded balancing." Paeahu, 150 Hawai'i at 532, 506 P.3d at 196.

Hu Honua maintains that when applying these factors to a renewable energy project, the "only permissible" comparison for the PUC to draw is with fossil-fuel plants. Considering a proposed renewable energy project's relative impacts or the displacement of other renewable energy projects is, apparently,

13

out-of-bounds.  If Hu Honua is right, the only relevant question before the PUC was: is burning trees better than burning coal?

Neither the language of HRS § 269-6(b) nor the legislative intent behind it supports this blinkered approach.  By drawing a hard line between fossil fuel and renewable energy, Hu Honua elides a crucial fact — producing biofuel, unlike producing other kinds of renewable energy such as solar or wind, emits high quantities of GHG emissions.  If the PUC couldn't consider Hu Honua's relative impacts and the likelihood that it would supplant other renewable projects, it would be forced to treat a project expected to emit millions of metric tons of carbon as no different from a project expected to emit almost no carbon, merely because both draw on renewable energy sources.

But the legislature intended the PUC to consider "potentially harmful climate change due to the release of harmful greenhouse gases."  MECO, 141 Hawai'i at 263, 408 P.3d at 15.  We do not lightly assume that the legislature would sabotage its climate goals by limiting the PUC to artificial and unhelpful analyses.

Further, HRS § 269-6 cannot be read in isolation from HRS § 225P-5 (Supp. 2021), another law relating to environmental quality, which sets a state policy of achieving carbon neutrality "as quickly as practicable, but no later than 2045."  HRS § 225P-5 mandates that we reduce emissions now, before the

14

damage done to the environment is irreversible — before action becomes impossible for future generations.  Hu Honua's constrained reading of HRS § 269-6(b) does not reflect the legislature's urgency.

Still, Hu Honua insists that Act 82, which recently amended HRS § 269-6(b), alters this analysis.  It does not.

Act 82's primary purpose was to exempt minor actions from the HRS § 269-6(b) analysis and to give the PUC discretion to determine on a case-by-case basis whether proceedings involving water, wastewater, and telecommunications projects require the HRS § 269-6(b) analysis.  The amendment also made a number of small, non-substantive changes.  Most relevantly, it arranged the four factors, previously stated in a sentence, into a numbered list.  We don't see how this typographical change in any way touches the substance of the statute.

Hu Honua also invokes the act's legislative history. During the law-making process, language explicitly including biomass was added and then removed from the amendment.  Hu Honua takes this as evincing a legislative intent to entirely exempt biomass emissions from consideration.  But, taken in context, the legislature's actions indicate its desire to preserve the statute's original language and interpretation.  The legislature was acting after MECO and HELCO I, cases that made clear HRS

§ 269-6(b) applied to emissions from biomass plants.  Adding language to that effect would have been superfluous.

Also, Act 82's main purpose was to exempt certain projects from the PUC's involved GHG analysis.  Had the legislature truly intended to exempt biomass emissions, it would have listed them with the other exemptions.

HRS Chapter 269 defines the Hawai'i Constitution's article XI, section 9 right to a clean and healthful environment, which encompasses the right to a life-sustaining climate system.  Paeahu, 150 Hawai'i at 538 n.15, 506 P.3d at 202 n.15.  Commanding a public agency charged with protecting the right to a life-sustaining climate system to disregard GHG emissions from a particular type of fuel source would undermine HRS Chapter 269.  We don't think the legislature intended to go there, much less through a minor amendment bill.

### C.

Lastly, Hu Honua asserts that the PUC violated its due process rights by finding its own facts, applying a higher evidentiary standard, and creating a carbon neutrality requirement.

First, the PUC's findings do not indicate that it tried to become its own "expert."  Compiling data provided by Hu Honua's expert into a table does not produce new facts, nor does weighing competing evidence and finding, for example, that

16

HELCO's projections were more credible than Hu Honua's. Under HRS § 269-92 (2020), electric companies must reach full carbon neutrality by 2045. By calculating that Hu Honua's project would reach cumulative carbon neutrality in 2047, as opposed to annual carbon neutrality in 2035, the PUC hewed to its statutory mandate.

Nor does the PUC's critical evaluation of the evidence Hu Honua presented equate to applying a higher evidentiary standard. Rather, it demonstrates a more mundane phenomenon: a fact-finder finding one side's facts unpersuasive.

Hu Honua stresses that it and HELCO were the only ones to introduce expert evidence at the proceeding. If only one side employs an expert, the argument seems to run, that expert *must* be believed. But Hu Honua misunderstands its evidentiary burden. Hu Honua had to persuade the PUC, not the other way around.

Further, treating one side's ability to retain an expert as decisive in proceedings would unacceptably interfere with the due process rights of parties who, while not able to field competing expert witnesses, may have valid attacks to make on the credibility or persuasive force of expert evidence.

Third, Hu Honua argues that the PUC applied a novel and inappropriate standard: whether the project would achieve carbon neutrality. But it was Hu Honua, not the PUC, who introduced

the idea of carbon neutrality into the proceedings.  In fact, Hu Honua went further – it pledged to be carbon *negative*.  Carbon neutrality was key to Hu Honua's pitch, going directly to the reasonability of its costs in light of its GHG emissions.

As HRS § 269-9 (2020) recognizes, higher energy costs may be justified when the energy source avoids the harmful impacts of fossil fuels.  But biomass and fossil fuel sources share one important defect — high GHG emissions.  Hu Honua appears to have recognized that its project would not be found reasonable by the PUC if it offered both high costs *and* high emissions.  So it argued that its emissions, once offset by tree planting, would amount to zero.  How convincing the PUC found this carbon claim is an issue of fact, not the creation of a new legal rule.

Even if the PUC adopted carbon neutrality as a standard, it is not so clear that the agency would have erred.

We have said that an agency "must perform its statutory function in a manner that fulfills the State's affirmative constitutional obligations," Paeahu, 150 Hawaiʻi at 538, 506 P.3d at 202, and that "[a]rticle XI, section 9's 'clean and healthful environment' right as defined by HRS chapter 269 subsumes a right to a life-sustaining climate system," id. at 538 n.15, 506 P.3d at 202 n.15.  The right to a life-sustaining climate system is not just affirmative; it is constantly evolving.

The people of Hawai'i have declared "a climate emergency." S.C.R. 44, S.D. 1, H.D. 1, 31st Leg., Reg. Sess. (2021). Hawai'i faces immediate threats to our cultural and economic survival: sea level rise, eroding the coast and flooding the land; ocean warming and acidification, bleaching coral reefs and devastating marine life; more frequent and more extreme droughts and storms. Id. For the human race as a whole, the threat is no less existential.

With each year, the impacts of climate change amplify and the chances to mitigate dwindle. "The Closing Window: Climate crisis calls for rapid transformation of societies," Emissions Gap Report 2022, https://www.unep.org/resources/emissions-gap-report-2022 [https://perma.cc/6JAR-RFZE]. "A stepwise approach is no longer an option." Id. at page xv.

The reality is that yesterday's good enough has become today's unacceptable. The PUC was under no obligation to evaluate an energy project conceived of in 2012 the same way in 2022. Indeed, doing so would have betrayed its constitutional duty.

Because the PUC's actions aligned with its statutory and constitutional obligations, we affirm PUC Order Nos. 38395 and 38443.

| | |
|---|---|
| Bruce D. Voss<br>(John D. Ferry III, Dean T. Yamamoto, Wil K. Yamamoto, and Jesse J. Smith on the briefs)<br>for Hu Honua Bioenergy, LLC | /s/ Mark E. Recktenwald<br>/s/ Paula A. Nakayama<br>/s/ Sabrina S. McKenna<br>/s/ Michael D. Wilson<br>/s/ Todd W. Eddins |



Joseph A. Stewart
(Marissa L.L. Owens, David M. Louie, Bruce A. Nakamura, and Aaron R. Mun on the briefs)
for Hawai'i Electric Light Company, Inc.

Edward M. Knox
(Scott D. Boone on the briefs)
for Division of Consumer Advocacy Department of Commerce and Consumer Affairs

Mark J. Kaetsu
(Caroline C. Ishida on the briefs)
for Public Utilities Commission

Chase H. Livingston
for Life of the Land

Sandra-Ann Y.H. Wong
for Tawhiri Power LLC